BUFFALO INDUSTRIAL BANK, Plaintiff, *v.* CLEMENT DE MARZIO, Defendant.*

City Court of Buffalo, May 4, 1937.

*Moot, Sprague, Marcy, Carr & Gulick* [*Whitney W. Gilbert* of counsel], for the plaintiff.

*Saperston, McNaughtan & Saperston* [*R. K. Wilson* `of counsel], for the defendant.

SUMMERS, J. The bank is suing as the holder of a note which had its inception in a conditional sales contract between the seller, the Pioneer Air Conditioning Company, and the buyer (defendant).

The facts run thus: The seller conferred with the buyer, delivered an oil stove to his flat. The proposed sale was then submitted to the credit department of the bank. The bank approved and gave the seller the form of conditional sales note contract used in this

* Reversed, without opinion, September 24, 1937.— [REP.

transaction. This form has on it, in heavy, readable letters at the top, the name of the bank. Among other blanks filled in in the form was the statement that the buyer had paid ten dollars. The buyer denies that he ever paid a cent. The buyer further sets up as his defense that the stove was delivered to him by the seller on the guaranty that it would heat his flat, after the seller had surveyed his premises. The buyer testifies that the oil stove did not fulfill the hopeful promise of the seller; that he notified the seller of this fact, and told him to take the stove back. At the end of two months the stove was retaken by the process of replevin, and, at public sale, was sold by the seller to himself for twenty dollars. The bank is now suing on the basis of the following calculations: Original price of stove, fifty dollars; finance charge, two dollars and fifty cents; total, fifty-two dollars and fifty cents. Credits: Alleged payment by buyer of ten dollars; realized by sale of stove to seller, by himself, twenty dollars; unpaid balance, twenty-two dollars and fifty cents. To this, by reason of the terms of the contract, the bank asks for an attorney's fee of three dollars and thirty-eight cents, together with a minimum suit fee of seven dollars and fifty cents, making a total of thirty-three dollars and thirty-eight cents, which, if the bank recovers, the defendant will be forced to pay for the companionship of the stove for two months, while it efficiently demonstrated the second law of thermodynamics, to wit, that the universe has a tendency to grow constantly colder.

The steady recurrence of conditional sales problems, while not involving in any instance a large sum, is of seeming importance in that they constantly touch many lives, causing some financial hardship; but, beyond the money loss, their judicial treatment in some instances has left a vivid sense of injustice lingering with the lowly, who, for the most part, are not capable of subtle legalistic analysis. Hence the following examination of the background of facts against which the modern conditional sale operates.

Judges, like other human beings, may be taken to know the common environment of the day.

In the yesterday of business the ordinary retail purchaser of goods had but one relationship to his merchant, that of credit extended on a personal, unsecured promise to pay.

The average citizen, and particularly the financially unimportant, was no more likely to know the law of negotiable paper, or the parol evidence rule, than the holding in Shelley's case.

But almost over night the picture changed, and today, from basinette to burial, the conditional sale contract is the constant companion of our citizenry. The attempt, which has gone with this development, to project the law merchant, designed and

intended for dealing between merchants, into the field of what may be termed " household " law, has failed, as it was bound to fail, to meet the prevailing sense of justice.

It is common knowledge that, whatever the situation as to finance companies was in the past, today they have become *de facto* departments of the great automobile businesses, without which these industries could no more operate than *sans* their assembly lines. The fiction has been permitted to flourish that these finance companies are foreign and distinct organizations, a fiction which no one, however, believes. All sales, when credit is sought, are approved by these financial agencies, and future collections are placed immediately in their hands. They have become integrated in the business, part and parcel of the one thing.

In the smaller industries, which could not afford the organization of separate finance companies, the same work has been done by institutions such as the bank plaintiff in this case, who, in their turn, take over the credit management and collection of accounts for, and become as integral a part of, the operation of these smaller enterprises as do the individually-owned finance corporations of the greater merchandising companies.

Looking, without the distortion of ancient notions, at the picture thus presented, we find the actual control and management of the credit and finance of sellers doing a conditional sale business in the hands of these finance corporations.

It is obvious that here we have a factual joint enterprise in which, so far as conditional sales are concerned, the management rests in the far larger part in the hands of the finance companies. The finance company and the merchant-seller are as a fact engaged in one business, like Longfellow's description of man and woman, useless one without the other. To pretend that they are separate and distinct enterprises is to draw the veil of fiction over the face of fact.

Seeing thus in true focus, should we permit the finance company to isolate itself behind the fictional fence of the law merchant? Should we give ear to its protestations that it has followed the Biblical injunction and has let not its right hand (the finance company) know what its left hand (the sales department) is doing, and, therefore, should be unbound by the representations to the buyer by the sales division of the joint business, representations and promises at variance with the terms of the printed form, a printed form impossible of reading in the present instance save with a magnifying glass, and comprehensible only by a commercial lawyer? Should we thus throw the burden of caution on the untrained run-of-the-mill buyer, who by every means known to

sales artistry has been induced to believe that he is dealing with an honorable house? Should not the risk of the fraud and misrepresentation of the salesman be the risk of the business, rather than the risk of the unwary buyer? The finance company, being a *de facto* part of a great conditional sale commercial machine, should be no more allowed to escape from the effects of the misrepresentation of a salesman than is the merchant himself. This rule imposes no great hardship on the finance company. Zeal is shown in investigating the credit of the buyer; let zeal likewise be expended in investigating the good faith of the salesman. If any hardship is imposed by this rule it is only the hardship that has always followed the refusal of the law to permit the divorce of honor from enterprise.

Our problem, then, stripped of its masquerade of legal verbiage, comes to this:

A stove was sold to a householder under a promise that it would heat his home. In this it failed. The stove was taken back by the seller after two months had passed and ten dollars had been paid him.

The seller thus has his stove and ten dollars.

Under the facts the law can give him no more. Justice also seems satisfied.

Let judgment be entered for the defendant.