Implement Credit Corporation, Respondent, vs.
Elsinger, Appellant.*

*October 8—November 9, 1954.*

---

* Motion for rehearing denied, with $25 costs, on January 11, 1955.

144

146

148

150

For the appellant there was a brief and oral argument by *J. M. Peters* of Hartford.

For the respondent there was a brief by *Callahan & Arnold* of Columbus, and oral argument by *Carroll B. Callahan* and *E. Clarke Arnold*.

CURRIE, J.  The issue presented on this appeal is whether the plaintiff finance company is a holder in due course of the note executed by the defendant Elsinger so as to be free from any defense that Elsinger might have against the payee Bierman-Turnacliff, Inc.  Counsel for the defendant advances the following reasons as to why he contends plaintiff is not such a holder in due course:

(1)  That proof of ownership of the note in plaintiff is not established;

(2)  That the note was transferred by the payee by means of an assignment which purported to transfer only the "title and interest" of the payee, and, therefore, such assignment did not constitute an indorsement within the provisions of the Uniform Negotiable Instruments Act as embodied in our Wisconsin statutes; and

(3)  The plaintiff finance company was so closely associated with the Wisconsin Implement Dealers Association and its members, such as the payee Bierman-Turnacliff, Inc., as to make the plaintiff a party to the original transaction between Bierman-Turnacliff, Inc., and Elsinger.

As to the first point raised, the answer of the defendant denied that the plaintiff finance company was the lawful holder and owner of the note.  At the trial the note was in the possession of the plaintiff and bore the assignment on the back to plaintiff, dated June 5, 1952, set forth in the statement of facts preceding this opinion, such assignment pur-

porting to have been executed by Bierman-Turnacliff, Inc. Furthermore, Kovacs, the general manager of plaintiff finance company, testified that the plaintiff had purchased such note from Bierman-Turnacliff, Inc., on June 5, 1952, and had advanced as consideration therefor the sum of $3,322.62.

Sec. 116.54, Stats., which is sec. 49 of the Uniform Negotiable Instruments Law (hereinafter referred to as the "N. I. L."), provides that, where a payee of a note payable to his order transfers it for value without indorsing it, such transfer vests in the transferee such title as the transferor had therein. Therefore, the foregoing evidence clearly proved the plaintiff to be the owner of the note.

Counsel for the defendant maker, however, maintains that there has been a failure of proof on the part of the plaintiff to establish it as a "holder" of the note because it offered no testimony that the signature "Bierman-Turnacliff, Inc.," to the assignment on the back of the note was actually subscribed by an authorized officer or agent of such corporation. Under the provisions of sec. 328.26, Stats., plaintiff was not required to establish the authenticity of such signature because of the statutory presumption that such signature was genuine. Such statute provides as follows:

"In all actions brought on promissory notes or bills of exchange by the indorsee the possession of the note shall be presumptive evidence that the same was indorsed by the persons by whom it purports to be indorsed."

In the case of a corporation indorser such presumption would necessarily embrace the element that whoever had signed the corporation's name as indorser had authority so to do. A "holder" of a negotiable instrument is defined by sec. 116.01 (7), Stats. (sec. 191 of the N. I. L.), to be "the payee or indorsee of a bill or note, who is in possession of it, or the bearer thereof." Thus, the possession in plaintiff, plus the presumption of the genuineness of the indorsement, established the plaintiff as the holder of the instrument.

The second point raised by defendant is that the assignment to plaintiff appearing on the back of the note did not constitute an "indorsement" within the provisions of the N. I. L. In order for the plaintiff to be a holder in due course of the instrument within the provisions of sec. 116.57, Stats., (sec. 52 of the N. I. L.), it must have been "negotiated" to plaintiff. Sec. 116.35, Stats. (sec. 30 of the N. I. L.), provides:

"An instrument is negotiated when it is transferred from one person to another in such manner as to constitute the transferee the holder thereof. If payable to bearer, it is negotiated by delivery; *if payable to order it is negotiated by the indorsement of the holder. completed by delivery."* (Italics supplied.)

An "indorsement" is defined in the succeeding sec. 116.36, Stats. (sec. 31 of the N. I. L.), as follows:

"The indorsement must be written on the instrument itself or upon a paper attached thereto. The signature of the indorser, without additional words, is a sufficient indorsement."

Therefore, the signature "Bierman-Turnacliff, Inc.," on the back of the note without any words of assignment would have constituted an indorsement. Does the addition of the words of assignment printed above such signature prevent it from being an indorsement? The general rule applicable is stated in 8 Am. Jur., Bills and Notes, p. 55, sec. 320, as follows:

"The rule supported by the weight of authority and reason is that an assignment written on a negotiable instrument constitutes an indorsement of it, but there is authority that it does not have such an effect, at least where it is an assignment of the assignor's interest in the instrument rather than of the instrument itself."

The same rule is set forth in 10 C. J. S., Bills and Notes, p. 695, sec. 208 b, as follows:

"The general rule is that a writing on the back of a bill or note with the intention of transferring title is an indorse-

ment, although it is in terms an assignment, but in some jurisdictions, however, such a transfer has been held not an indorsement."

In *Thorp v. Mindeman* (1904), 123 Wis. 149, 152, 101 N. W. 417, 68 L. R. A. 146, 107 Am. St. Rep. 1003, a mortgage note was transferred by the payee thereof to the plaintiff by means of the following assignment written upon the note:

" 'For value received, I hereby sell, transfer, and assign the within note and the interest coupons thereto attached and numbered four to six inclusive (previous interest coupons having been paid and surrendered), to Josephine Thorp, without recourse.' "

The court held that such assignment constituted an indorsement within the law merchant. Such reference to the law merchant must be deemed to mean the law merchant as embodied in the N. I. L. adopted by our legislature when it enacted ch. 356, Laws of 1899, which enactment was effective prior to the date of the assignment to plaintiff. The N. I. L. in most respects is but a codification of the law merchant. 10 C. J. S., Bills and Notes, p. 419, sec. 11 b. In arriving at its conclusion that the assignment constituted indorsement, the court stated (p. 162):

"While there is doubtless some authority tending to support appellants' claim [that the assignment did not constitute a commercial indorsement], we think that there can be no doubt that the transfer in the present case must be held to be a commercial indorsement under the decisions of this court in the cases of *Crosby v. Roub,* 16 Wis. 616; *Bange v. Flint,* 25 Wis. 544; *Murphy v. Dunning,* 30 Wis. 296. In all of these cases a negotiable note was transferred by attaching it to a negotiable bond which recited that the note was thereby 'assigned and transferred' to the holder of the bond as security for the payment of the bond, there being no indorsement on the note itself; and this was held an indorsement within the law merchant. Here there is an agreement on the back of the note itself, signed by the payee, by which he sells, assigns, and transfers the note to the plaintiff. The intent

to pass title and make the note transferable by indorsement and delivery afterwards seems very plain. Such, also, seems to be the current of authority. 1 Daniel, Neg. Inst. (5th ed.) sec. 688c."

Counsel for defendant point out that in the instant case the material words of the assignment are "assign and transfer . . . all their *title and interest* to the within note," while in the assignment before the court in *Thorp v. Mindeman, supra,* they were *"assign the within note."* We can perceive no good reason why, if the latter constitutes an indorsement under the N. I. L., the former does not also.

Counsel cites on this point the case of *Gale v. Mayhew* (1910), 161 Mich. 96, 125 N. W. 781, 29 L. R. A. (N. S.) 648. This case is also cited in footnote 8 of 8 Am. Jur., Bills and Notes, p. 56, sec. 320, as an authority for the statement in the text hereinbefore quoted for the minority rule that an assignment does not constitute an indorsement when the assignor only assigns his interest in the instrument. In this case the defendant Mayhew's negotiable note executed to one Pelton, as payee, was purchased by the plaintiff Gale, and there was written upon the note the following assignment (p. 98) : "I hereby assign my interest in this note to William H. Gale. [signed] W. R. Pelton." Plaintiff brought suit on the note against the maker Mayhew. At the close of the trial the defendant moved for a directed verdict on the ground that the note had simply been assigned to plaintiff and, therefore, under sec. 10054, 2 Compiled Laws of Michigan, 1897, plaintiff had no right to bring suit in his own name, which motion was denied. Such statute had been in effect for fifty years and provided that an assignee of a nonnegotiable instrument could bring suit in his own name, but the Michigan courts had construed such statute as also providing for the converse, *i. e.,* that the assignee of a negotiable instrument could not sue in his own name but must bring suit in the name of his assignor. The Michigan supreme court, however, rec-

ognized that by reason of the adoption of the N. I. L. in Michigan a transferee of a negotiable note by indorsement could sue in his own name. The judgment of the trial court in favor of the plaintiff was reversed on the basis of that section of the Michigan statutes corresponding to sec. 116.43, Wis. Stats. (sec. 38 of the N. I. L.), which provides: "A qualified indorsement constitutes the indorser a mere assignor of the title to the instrument. It may be made by adding to the indorser's signature the words 'without recourse' or any other words of similar import. . . ." The court construed the assignment by Pelton to be such a qualified indorsement, and, therefore, held that he was a mere assignor so that sec. 10054, 2 Michigan Compiled Laws, 1897, was applicable, and plaintiff was barred from suing in his own name.

It seems to us that the Michigan court in *Gale v. Mayhew, supra,* missed the point that a qualified or restrictive indorsement is nevertheless an indorsement under sec. 33, of the N. I. L. (sec. 116.38, Stats.), the same as is an unqualified or unrestrictive indorsement, and whether a holder takes by way of a qualified indorsement, or an unrestrictive one, does not affect his status as a holder in due course. Whether the assignor Pelton could be held liable as an ordinary indorser was beside the point, as would be the question in the instant case of whether Bierman-Turnacliff, Inc., could be held liable on such ground. This is an entirely extraneous issue upon which there is a considerable division of authority. A summary of the authorities thereon is to be found in *Fecko v. Tarczynski* (1937), 281 Mich. 590, 275 N. W. 502, and *Copeland v. Burk* (1916), 59 Okla. 219, 158 Pac. 1162, L. R. A. 1917A, 1165.

It is our conclusion that the assignment by Bierman-Turnacliff, Inc., to the plaintiff finance company constituted an indorsement under the provisions of secs. 116.36 and 116.38, Stats., so that the note was negotiated to plaintiff by indorsement within the meaning of sec. 116.35.

This brings us to the third and last contention made in behalf of the defendant, viz., that there was such a close association between the plaintiff and Bierman-Turnacliff, Inc., as to make the plaintiff a party to the original transaction between Bierman-Turnacliff, Inc., and the defendant Elsinger thereby preventing the plaintiff from being a holder in due course. The grounds advanced in support of such contention are: (1) The plaintiff finance company was incorporated by members of the Wisconsin Implement Dealers Association to provide a finance service to the members of the association, and the plaintiff limited its purchase of commercial paper to members of the association; (2) the plaintiff supplied the blank forms for the note, conditional sales contract, and financial statement which were executed by Elsinger; and (3) the existence of the signed dealer's agreement between plaintiff and Bierman-Turnacliff, Inc., providing for the deduction of five per cent of the net amount of the contract for which the note was executed, and retention of same by plaintiff in the dealer's reserve account of Bierman-Turnacliff, Inc.

There is no evidence in the record that plaintiff did not act in perfect good faith when it purchased the Elsinger note and contract, as it was some five months later when it learned for the first time of any fraudulent practices on the part of Bierman-Turnacliff, Inc.

Counsel for defendant cites no authorities in support of his position that, because certain members of the Wisconsin Implement Dealers Association incorporated the plaintiff finance company for the purpose of financing members of the association, and the plaintiff limited its purchases of commercial paper to members of the association (Bierman-Turnacliff, Inc., being such a member), such facts prevent plaintiff from being a holder in due course of the note which is the subject of the within action. This falls far short of establishing

any relationship of principal and agent between plaintiff and Bierman-Turnacliff, Inc. We deem such evidence to be immaterial on the issue of whether plaintiff is a holder in due course unless coupled up with other facts showing actual direct participation by plaintiff in the original transaction between Elsinger and Bierman-Turnacliff, Inc.

There is a division of authority on the question of whether the supplying of blank forms of notes, conditional sales contracts, chattel mortgages, etc., by a finance company, which customarily purchases customer paper from the dealer, is evidence from which it can be found that the finance company is not a holder in due course of notes so purchased.

*Mayer v. American Finance Corp.* (1935), 172 Okla. 419, 45 Pac. (2d) 497, held that the fact that a finance company furnishes an automobile dealer with blank notes having a form of assignment to the finance company printed on the back thereof is not evidence tending to show that the dealer is the finance company's agent, in taking a note from a purchaser of the vehicle from the dealer, so as to render the finance company chargeable with notice of the dealer's act in taking a usurious note.

In *Allied Building Credits, Inc., v. Mathewson* (1952), 335 Mich. 270, 55 N. W. (2d) 826, the finance company supplied all customers, from whom it purchased customer notes, blank forms of notes having printed on the back "without recourse, pay to the order of Allied Building Credits, Inc.;" and the Michigan court refused to find from such fact that there was such an intimate connection between the dealer and the finance company as to prevent the finance company from being a holder in due course.

While it is not directly stated in *International Finance Co. v. Magilansky* (1932), 105 Pa. Super. Ct. 309, 161 Atl. 613, that the plaintiff finance company supplied the form of note to the dealer upon which suit was brought, the name of the

finance company was printed in the indorsement on the back of the note so it is a reasonable inference that the blank form of note had been supplied to the dealer by the finance company. The note had been given to the dealer in purchase of a furnace and it was brought out that all customer notes of such particular dealer were customarily transferred to the plaintiff finance company. The Pennsylvania court held that these facts, together with others, were not sufficient to establish that the plaintiff finance company was not a holder in due course.

On the other hand, the cases of *Commercial Credit Co. v. Childs* (1940), 199 Ark. 1073, 137 S. W. (2d) 260, 128 A. L. R. 726, and *Mutual Finance Co. v. Martin* (Fla. 1953), 63 So. (2d) 649, both stress the fact that the plaintiff finance companies in those two cases had supplied blank printed forms of instruments to the dealers. It was held that this tended to establish direct participation on the part of the finance company in the transaction between the purchaser and the dealer so as to prevent the finance company from being a holder in due course.

We must take cognizance of the fact that a very large percentage of the sales of motor vehicles, farm machinery, electrical appliances, furnaces, and similar articles are made by dealers to their customers on credit, whereby the purchaser makes a down payment in cash or trade-in and gives his negotiable note for the balance secured by a conditional sales contract or chattel mortgage. These notes usually provide for monthly instalment payments extending over fairly long periods of time. Most dealers have not the capital to carry such notes and at the same time replenish their inventory stock so it is customary for them to discount such notes with a finance company or bank. A very considerable segment of our economy is dependent for its continued prosperity upon such free flow of credit, and anything which delays or im-

pedes such process may well be regarded as against the public interest. Finance companies and banks hesitate to purchase such notes, contracts, and chattel mortgages, if executed on printed forms with which they are not familiar, without first submitting them to the scrutiny and opinion of their attorneys. To obviate such delays and expense, these financial institutions have widely adopted the practice of having their own attorneys draft forms of notes, including the indorsements or assignments on the back, chattel mortgages, and conditional sales contracts, and then have had the same printed and supplied to the dealers from whom they customarily purchase customer paper. By so doing such banks and finance companies are better enabled to render prompt service to dealers when they present customer paper for discount because there is no delay occasioned by passing on the forms of the instruments when their own forms have been used by the dealers.

We can perceive of no reason based upon either logic or public policy why a finance company or bank which supplies such blank printed forms should be held thereby to have constituted the dealers their agents, or should be deemed to have participated in the sale by the dealer to the customer, including the execution of any contract, mortgage, or note which the customer may have executed to the dealer. For these reasons, this court does not consider the cases of *Commercial Credit Co. v. Childs, supra,* and *Mutual Finance Co. v. Martin, supra,* holding to the contrary on this point should be followed as precedents in this state for we believe them to be based upon an unsound premise.

We recognize that *Commercial Credit Co. v. Childs, supra,* has been quite widely cited with approval by other courts, but the only instance we have been able to discover in which the act of the finance company in furnishing blank forms seems to have been the material factor that may have governed the

result is that of *Mutual Finance Co. v. Martin, supra.* For example, *Commercial Credit Co. v. Childs* was cited in *Commercial Credit Corp. v. Orange County Machine Works* (1950), 34 Cal. (2d) 766, 214 Pac. (2d) 819, and *Davis v. Commercial Credit Corp.* (1950), 87 Ohio App. 311, 94 N. E. (2d) 710, but in the California case there was evidence of direct participation by the finance company in the transaction between the dealer and the customer prior to the signing of the instrument by the customer, while in the Ohio case there was evidence tending to establish notice to the finance company of past fraudulent practices on the part of the dealer. Such facts readily distinguish these two cases from the case at bar.

In the instant case when the plaintiff finance company purchased the note and contract from the dealer, Bierman-Turnacliff, Inc., it deducted from the proceeds due the dealer the sum of $174.88 and credited the same to the dealer's reserve account. Such sum represented five per cent of the face of the note less the amount of the finance charges, life insurance premium, and recording charges. In other words, the five per cent was based on the net balance purported to be owed by Elsinger for the machinery before the addition of any finance charges, insurance premium, and recording charge. The deduction of such $174.88 was a matter which solely concerned the plaintiff and the dealer in which the customer Elsinger had no interest. The dealer's agreement entered into between the plaintiff and Bierman-Turnacliff, Inc. (the material terms of which are set forth in the statement of facts preceding this opinion), provided for such deduction and the disposition to be made of the amount credited to the reserve account of this dealer.

In *Mutual Finance Co. v. Martin, supra,* the plaintiff finance company had established a dealer's reserve account for the dealer, from whom it had purchased the note on which suit was brought, and had deducted $125 from the purchase

price of the note and placed it in such reserve account. The Florida court in its decision holding that the finance company was not a holder in due course did not cite this deduction as a fact which was material on such issue, but after reaching its conclusion commented that such $125 was obviously retained to protect the finance company against loss. Such comment is a *non sequitur* in so far as the issue of good faith is concerned.

If a customer defaults on a note given to a dealer in purchase of a motor vehicle, piece of farm machinery, or electric refrigerator, and the finance company or bank has to repossess and resell under the conditional sales contract or chattel mortgage, a loss often occurs due to excessive depreciation of the value of the repossessed article as a result of hard usage, or other causes. By making a comparatively moderate deduction from the purchase price of each note discounted for a dealer until the required reserve has been established the finance company or bank discounting dealers' paper protects itself against such a possibility of loss. If such a practice were held to prevent the finance company or bank from being a holder in due course of notes purchased from dealers, such holding would undoubtedly lead to the abolition of such dealers' reserve accounts by finance companies and banks with the probable result that higher finance charges would be insisted upon as an alternative method of protection against loss. For this reason such practice of establishing dealer reserve accounts may well be regarded to be in the interest of the consuming public who purchase automobiles, farm machinery, refrigerators, etc., on the time-payment plan. Certainly such practice does not operate to the disadvantage of such purchasers.

We deem the fact, that the amount in question was deducted by plaintiff from the proceeds due from it to Bierman-Turnacliff, Inc., and the crediting of the same to the latter's reserve account, to be entirely immaterial on the issue of

whether plaintiff is a holder in due course of such note. It in nowise established any direct participation by plaintiff in the original transaction between Elsinger and Bierman-Turnacliff, Inc., or tended to show lack of good faith on plaintiff's part.

Lastly, is the dealer's agreement which was entered into between plaintiff and Bierman-Turnacliff, Inc., evidence which mitigates against plaintiff being a holder in due course of the Elsinger note? We think not. One purpose of such agreement was to spell out the rights of the respective parties with respect to the reserve account of the dealer held by the plaintiff finance company. Such agreement, if anything, tended to discourage the dealer from obtaining any customer note through fraudulent practices, because paragraph 8 provided that, in the event plaintiff purchased such a note, it could require the dealer to repurchase the same rather than charge it against the dealer's reserve account.

It is our considered judgment that the learned trial court properly held that plaintiff was a holder in due course of defendant's note. In fact, we can discover no evidence in the record which would support a contrary finding.

*By the Court.*—Judgment affirmed.

The following opinion was filed January 11, 1955:

CURRIE, J. (*on motion for rehearing*). Defendant's counsel in his brief on rehearing states that in our former opinion we neglected to pass on his contention that the plaintiff finance company had failed to meet the burden of proof imposed on it by sec. 116.64, Stats. (sec. 59 of the N. I. L.), to establish that it was a holder in due course. The reason we did not discuss such issue is because we had assumed that defendant was only challenging plaintiff's title because of lack of proof of an authorized genuine signature to the assignment on the back of the instrument. Sec. 116.64 provides in part as follows:

". . . when it is shown that the title of any person who has negotiated the instrument was defective, the burden is on the holder to prove *that he* or some person under whom he claims *acquired the title as a holder in due course. . . ."* (Italics supplied.)

Fraud practiced by a party to a negotiable instrument to secure the execution of the same by another person makes the title of the former defective within the meaning of sec. 116.64, Stats. *Wakem v. Schneider* (1927), 192 Wis. 528, 213 N. W. 328; and *Jones v. Brandt* (1921), 173 Wis. 539, 181 N. W. 813. Therefore, in the instant case, because of the fraud practiced by Bierman-Turnacliff, Inc., upon the defendant Elsinger, the burden of proof was upon plaintiff to establish that it was a holder in due course.

Under sec. 116.57, Stats. (sec. 52 of the N. I. L.), which defines the prerequisite elements of the status of a holder in due course, the burden was upon plaintiff to prove that at the time it purchased the note:

(1) That the note was complete and regular upon its face;

(2) That plaintiff became the holder of it before it was overdue;

(3) That plaintiff took it in good faith and for value;

(4) That, at the time it was negotiated to plaintiff, plaintiff had no notice of any infirmity in the instrument or defect in the title of Bierman-Turnacliff, Inc.;

(5) That plaintiff took it in the usual course of business.

The note was offered in evidence as an exhibit and we find it complete and regular upon its face. The testimony of Kovacs, general manager of the plaintiff, adequately proved all of the other elements set forth in sec. 116.57, Stats., to establish that plaintiff was a holder in due course. We deem it unnecessary to summarize such testimony, except as to that relating to whether plaintiff, at the time it purchased the note, had notice of any infirmity in the instrument. As to this,

Kovacs was asked the following question and gave the following answer thereto:

"*Q*. Did you have any knowledge of any infirmity existing in these notes at that time? *A*. No."

The word *"you"* appearing in the foregoing question is ambiguous in that it could refer to either Kovacs or the plaintiff finance company, and defendant's counsel failed to cross-examine on this point. However, the trial court could rightly assume that the knowledge of Kovacs, as plaintiff's general manager, and that of the plaintiff company were one and the same in the absence of any evidence to the contrary.

The actual purchase of defendant's note by plaintiff was handled by a Miss Hansen, an employee in plaintiff's office, during the temporary absence of Kovacs from the office. Because Miss Hansen was not called as a witness by plaintiff to testify, defendant's counsel contends this in itself constituted a failure of proof by plaintiff on the issue of whether it was a holder in due course. We deem this argument to be fallacious as plaintiff had met its burden of proof through the testimony of Kovacs. If counsel for the defendant had any reason to believe that Miss Hansen, at the time she handled the purchase of the note, had obtained any knowledge of Bierman-Turnacliff, Inc.'s fraud which she had not communicated to Kovacs, counsel had the privilege of calling her as an adverse witness and examining her on such point. This counsel did not attempt to do.

*By the Court.*—The motion for rehearing is denied with $25 costs.