74 N.J. Super. 575 (1962)
181 A.2d 809
WESTFIELD INVESTMENT COMPANY, A CORPORATION OF NEW JERSEY, PLAINTIFF,
v.
LEWIS FELLERS AND ALMA FELLERS, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided May 14, 1962.
*576 Mr. George W. Morton, Jr., attorney for plaintiff.
Mr. Martin G. Bross, Jr., attorney for defendants.
HOPKINS, J.C.C.
This is a suit on a deficiency claim under a promissory note. The facts leading up to the making of the sales agreement and the execution of the conditional sales contract and promissory note were testified to by the defendants and were uncontroverted. On January 20, 1960 a Mr. Rosen, a representative of Ideal Home Food Service, contacted the defendants at their home at 137 Franklin Avenue, Nutley, New Jersey, regarding the sale *577 to them of a food plan and freezer deal. Mr. Rosen represented to the defendants that if they ordered $70 worth of food monthly for three years from "Ideal," the freezer in which the food was to be stored would belong to them at the end of the three year period. He represented that his company furnished the freezers to get the food business, and that the freezer in his company's proposition would not cost them a cent but would be absolutely free.
Prior to this offer by Mr. Rosen the defendants had entered into a food plan deal with L. Bamberger & Co. in which they knew they had to pay for the freezer. To the defendants, people of very limited means and obviously limited education, the prospect of securing the greater part of their food supply for their complete family of four at a rate of $70 a month and getting a freezer free, seemed not only enticing but also within their means. As a further inducement, Rosen told them they would receive one month's food supply free if they would sign immediately. Relying, therefore, on these representations, they readily accepted the Ideal proposition and, in some fashion not explored at the trial, were able to cancel their deal with Bamberger's.
Upon their acceptance of Rosen's deal, the defendants were prevailed upon to sign Ideal's "sales contract" and along with it a conditional sales contract and promissory note. The conditions under which these papers were signed, what they contained when signed, what they contained when copies were returned to the defendants, the contents of subsequent papers received by the defendants, and the events thereafter, were, to this court, not only illuminating but also distressing.
The so-called "sales contract" signed by both defendants is somewhat illustrative. At the time of the defendants' signing the only figure on the paper was that of $70, on the line and following the printed words "Total price for food and freezer monthly." Printed in the "contract" over the defendants' signatures appear the following items worthy of comment.
*578 a. Food spoilage insurance.
b. Lifetime (in place of the words "1 year service" which are crossed out.)
c. Lifetime (in place of the words "5 year warranty" which are crossed out.)
d. Lifetime membership in food plan.
e. All food unconditionally guaranteed.
f. This contract entitles you to repurchase food at prevailing quantity discount prices.
Reference to this instrument will be made later.
With the signing of the sales contract the defendants signed a conditional sales contract and an attached promissory note, in both of which the terms of payment and other pertinent data were not filled in at the time of signing. These forms, it is to be noted, were made up for the plaintiff, Westfield Investment Company, a financing company, and were supplied to Ideal by Westfield. In fact, the very body of the conditional sales contract contains an assignment clause which in bolder type describes Westfield Investment Company as the specific assignee. As the perforation on the promissory note and the conditional sales contract would indicate, they were at one time a single sheet of paper. On the reverse side of the conditional sales contract there is a purchaser's statement, with representations by them as to their financial condition. The purpose of this statement was to secure credit from the financing company, Westfield Investment, in order to effect the food plan sale.
Needless to say, when the defendants later received their copies of these papers, and the freezer and first delivery of food were made on January 26 and January 28, 1960, respectively, the sweet deal offered by Ideal had soured considerably. Much to their chagrin, financially and otherwise, the defendants learned for the first time that under the terms of the conditional sales contract and promissory note they were purchasing a freezer for $825 and food for $111, a total of $936, to which was added a finance charge of $354.72. The food item covered three monthly installments at $37 each. The freezer had to be paid for in 36 *579 installments of $32.77 each. No food would be delivered after the first delivery, later referred to, and all payments after the first three months were to be for the freezer only.
Their returned copy of the original "sales contract" presented by Rosen portrayed a somewhat different picture. By the terms of this instrument the defendants would appear to be committed to "Food Plan A," whereby they had to pay for food at the rate of $37.07 for four months and for the freezer at $32.93 per month for 36 months. On either basis the supposedly "free" freezer had become a costly proposition.
Upset by these circumstances, the bewildered defendants refused to make any payments, and the freezer and food were repossessed by the plaintiff and sold. The circumstances under which all of this took place will be referred to later.
At the outset it should be noted that this court, in an informal opinion delivered from the bench on January 25, 1962, held that the notice of sale of the freezer unit, given by certified mail, return receipt requested, was not in compliance with R.S. 46:32-25 and a judgment was entered for the defendants. This court, in so holding, relied on the opinion of Pacific Discount Co., Inc. v. Jackson, 68 N.J. Super. 331 (App. Div. 1961), certif. granted 36 N.J. 139 (1961). The Supreme Court reversed the Appellate Division decision in Pacific Discount Co., Inc. v. Jackson, 37 N.J. 169 (1962), and held that certified mail was not repugnant to the subject or context of R.S. 46:32-25 and was an authorized medium for the transmittal of notice of resale. However, that reversal by the Supreme Court, subsequent to the informal decision referred to, does not, of and by itself, require that judgment now be entered against the defendants if the original judgment in their favor should be sustained on other grounds.
The crux of this litigation is that the plaintiff, Westfield Investment Company, is primarily contending that, as a holder in due course of the promissory note, it is not subject to the defenses being raised by the defendants. The reliance *580 by defense counsel, at the time of trial, on the then prevailing decision of the Appellate Division in the Pacific Discount case perhaps deterred a more complete exploration by him of the other factual issues involved. This court, however, is required to determine from the testimony and exhibits presently before it whether the plaintiff is entitled to the protection of the preferred position it alleges it occupies.
Disregarding the discrepancy between the completed sales contract and the completed conditional sales contract and promissory note, an examination of the sales contract discloses the following items that the defendants were unquestionably led to believe they were contracting for with Ideal and which require comment.
(1) Food spoilage insurance  nowhere in the evidence is there the slightest hint that any attempt was made by Ideal to fulfill this item.
(2) Lifetime service and lifetime warranty  in evidence is a certificate in the form and color of a stock certificate. It is a printed form evidently issued by the manufacturer, Marquette Appliances, Inc., and unquestionably distributed in unlimited quantities by it to retailers throughout the country. It has various blanks, on the face and on the back, to be filled out, showing, for example, to whom issued, by whom installed, dealer's name, serial number, etc. Not one is filled in, and even if they were, an examination of the document discloses it is anything but an obligation for lifetime service and lifetime warranty.
(3) Lifetime membership in food plan  all food unconditionally guaranteed  this contract entitles you to repurchase food at prevailing discount prices. It cannot be denied that the defendants were led to believe and expected to receive from Ideal those items contained in their contract. What they did receive is another matter. The freezer was delivered and installed on January 26, 1960. On January 28, 1960 a concern named Wayne Home Food Service suddenly appeared at the defendants' home and loaded the freezer *581 with various items. The setup of Wayne, whether corporate or otherwise, and its connection with Ideal or the contract with the defendants, were neither explained nor explored. A copy of the delivery slip, bearing its name and left with the defendants, is a further illustration of the type of dealing that permeates this transaction. Opposite most of the items delivered, but not all, there appear the weight, the unit price and total amount. In the lower right hand corner is a place for total price containing the figure $148.28. The court computes the total figure at $107.18. Giving some consideration to the fact that on some items there are missing either weight, unit price or amount, or all three, the court is led to the query as to whether this delivery was made in an apparent attempt to conform with the so-called "Food Plan A" in the sales contract (four equal food payments of $37.07 per month), or with the terms of the conditional sales contract calling for food of $111 with one month free. If it be the latter, and allowing for the missing weights and prices, and assuming the weights, prices and total are correct, this is the only evidence of good faith in the record to the credit of Ideal. Be that as it may, from whom was the defendant to reorder food under the representations referred to above? The court cannot help but note, in passing, that one of the items on the delivery slip is "Staples  $28.18." Examination of the list of so-called staples shows that they consisted of 1 box of tea, 8 pounds of coffee, 5 cans of pork and beans, 2 cans of peas, 1 case of condensed milk and 4 boxes of S.O.S., 4 packages of tissue, 8 cans of Ajax, 4 cans of Vel, 4 boxes of Dreft and 2 boxes of Dash. The defendants had, in truth, been taken to the cleaners.
Upon the delivery of the food and receipt of their copies of the papers, the defendants attempted to contact Ideal. The result was that a Frank Scriveri, of Wayne Home Food Service, personally came to the defendants' home in an effort to pacify them. The defendant, Lewis Fellers, told Mr. Scriveri that the contract had been misrepresented *582 and that he didn't want any part of the deal. Whereupon, Mr. Scriveri offered the defendants a supply of food in excess of the $37 food value in order to make up for the difference between the $70 of food supposedly ordered and that actually received. It was clearly established that the defendants could not feed four persons, including themselves, on $37.07 per month. If the defendants would accept this new deal, Mr. Scriveri said they would be allowed some extra food free of charge. This free extra food allowance was authorized in writing and bears the signature of "Frank V. Scriveri." The defendants refused to accept and asked Mr. Scriveri to take the food and freezer back.
On June 3, 1960 Charles Ruymen, a constable located at 624 Paterson Plank Road, East Rutherford, New Jersey, came to the defendants' house at the request of Westfield Investment Company and repossessed the Marquette refrigerator-freezer combination with food. Mr. Ruymen testified that the freezer "was still packed with food. You couldn't get another pound of butter in it." His testimony, in this respect, corroborates that of the defendants who said that they did not use any of the food delivered to them.
Notice of the proposed sale to be held on Monday, June 20, 1960, at 4 P.M. was sent to the defendants by certified mail with return receipt requested. The freezer which sold for a cash price of $825, exclusive of financing charges on January 20, 1960, was purchased by Meatland, 862 Route #23, Wayne, New Jersey, for $250 on June 20, 1960. Within six months, a new freezer which had been standing in a corner of the defendants' kitchen was worth less than one-third of its original cost, and in this proceeding the plaintiff now seeks a deficiency judgment of $1,420.75. The constable said that the price realized at the sale was a fair and reasonable one despite the fact that he described the freezer as "Very, very clean, like new," and "It was repossessed, but it was like new." Nothing was paid for the food being stored in the freezer. It appears *583 that the freezer purchaser, Meatland, also retained the food, and had represented to the constable that they were the original suppliers of the food. The relationship, if any, between Meatland, Wayne Home Food Service, and Ideal Home Food Service was never explored during the course of the trial.
In this case fraud in the inducement and failure of consideration have clearly been established. Plaintiff seeks to avoid these defenses by cloaking itself in the garb of a holder in due course. To qualify as a holder in due course R.S. 7:2-52 requires, among other things, that a holder take an instrument "in good faith and for value" and (emphasis added) "That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it." R.S. 7:2-59 provides that "every holder is deemed prima facie to be a holder in due course," and R.S. 7:2-56 provides that "To constitute notice of an infirmity in the instrument or defect in the title of the person negotiating the same, the person to whom it is negotiated must have had actual knowledge of the infirmity or defect, or knowledge of such facts that his action in taking the instrument amounted to bad faith." In construing this last section of the Negotiable Instruments Law, our courts have consistently adhered to and frequently quoted the rule expressed in Rice v. Barrington, 75 N.J.L. 806, 807 (E. & A. 1908):
"* * * proof of circumstances calculated merely to arouse suspicion will not defeat recovery on a negotiable note taken for value before maturity. Bad faith  i.e., fraud, not merely suspicious circumstances  must be brought home to a holder for value whose rights accrued before maturity in order to defeat his recovery on a negotiable note upon the ground of fraud in its inception or between the parties to it."
See Driscoll v. Burlington-Bristol Bridge Co., 8 N.J. 433, 479-485 (1952), and the cases cited therein.
However, even within the ruling of Rice v. Barrington, supra, and Driscoll v. Burlington-Bristol Bridge Co., supra, *584 it would seem that present day commercial practices require that the court inquire in a particular case as to what facts constitute more than "merely suspicious circumstances" affecting the "good faith" required of a holder in due course.
The doctrine of "good faith" in relation to a holder in due course has had an interesting career. In the celebrated case of Gill v. Cubit, 3 B & C 466 (1824) the rule was laid down by the Court of King's Bench that the purchaser of negotiable paper must exercise reasonable prudence and caution, and that if the circumstances were such as ought to have excited the suspicion of a prudent and careful man, and he made no inquiry, he did not stand in the legal position of a bona fide holder. In other words, that suspicious circumstances alone would let in equities and defenses against such a purchaser. Reasoning that strict adherence to this rule would prevent commercial paper from performing its primary function of passing freely and quickly like coins or currency, the English courts, 12 years later, in Goodman v. Harvey, 4 A & E 870 (1836), rejected it in place of the rule that nothing short of actual knowledge of defects, infirmities and bad faith would deprive the purchaser of the character of a holder in due course. Although overruled in England, some courts in the United States continued to follow the rule in Gill v. Cubit of the reasonably prudent man, while others adopted the rule of Goodman v. Harvey.
That the question is still of present-day concern is shown by the fact that the national sponsors and drafters of the Uniform Commercial Code (approved in New Jersey November 30, 1961, effective January 1, 1963) declared in 1952 in the Official Draft of Text and Comments that "a holder in due course is a holder who takes the instrument (b) in good faith including observance of the reasonable commercial standards of any business in which the holder may be engaged; and (c) without notice it is overdue or has been dishonored or of any defense against or claim to it on the part of any person."
*585 The Code's comment states:
"A business man engaging in a commercial transaction is not entitled to claim the peculiar advantage which the law accords to the good faith purchaser  called in this context holder in due course  on a bare showing of `honesty in fact,' when his actions fail to meet the generally accepted standards current in his business, trade or profession."
Objection to this rule by banks, commercial institutions and lawyers resulted in its deletion in that form in 1954.
The Uniform Commercial Code, effective in New Jersey January 1, 1963, defines a holder in due course as one who takes the instrument "for value; and in good faith; and without notice * * * of any defense against * * * it on the part of any person." (Emphasis added)
Applying the doctrine of good faith to the complete facts in this case, it appears to this court that the Westfield Investment Company cannot qualify as a holder in due course. Westfield Investment Company was no stranger to the transaction between the seller, Ideal Home Food Service, and the purchasers, the defendants herein. Westfield Investment supplied this particular seller, among others, with the conditional sales contract and promissory note forms. Westfield Investment Company was mentioned as the specific assignee in bolder type in the conditional sales contract which, together with the promissory note, was a part of single perforated line sheet of paper. The purchaser's statement on the reverse side of the sheet was designedly included in order that the purchaser might secure credit from Westfield Investment Company. This court is not about to hold that the mere supplying of negotiable forms in blank by the financing company to a vendor is sufficient to strip the financing company of its holder in due course status. However, this court is saying that the supplying of such forms is one of the factors to be looked at in defining the relationship existing between the parties, namely, the vendor, the financing company and the maker.
*586 New Jersey courts have not previously dealt with the issue presented by this factual circumstance; other courts have. There are some jurisdictions in which the courts transfer the knowledge of the payee-vendor to the endorseefinance company on the theory that the finance company is so directly interested and involved in the transaction of purchase that it cannot escape the legal imputation that it stands in the shoes of the vendor. Commercial Credit Co. v. Childs, 199 Ark. 1073, 137 S.W.2d 260, 128 A.L.R. 726 (Sup. Jud. Ct. 1940); Clark v. Roberts, 206 Mass. 235, 92 N.E. 461 (Sup. Ct. 1910); Commercial Credit Corp. v. Orange County Machine Works, 34 Cal.2d 766, 214 P.2d 819 (Sup. Ct. 1950); Mutual Finance Co. v. Martin, 63 So.2d 649, 44 A.L.R.2d 1 (Fla. Sup. Ct. D. 1953).
In the case of Mutual Finance Co. v. Martin, supra, a finance company sought to recover the amount due on a promissory note. The maker of the note tried to set up the defenses of failure of consideration and fraud of the vendor in the sale of a Tyler Deep Freezer. The court, in holding that the finance company was precluded from claiming as a holder in due course, relied on the facts that the assignee finance company supplied the forms for the note and the conditional sales contract and investigated the credit of the purchaser. Both these factors are present in the instant case. Furthermore, in responding to the argument that the removal of the finance company from the holder in due course rank would seriously fetter the negotiability of commercial instruments and, consequently, impede business transactions generally, the Florida court made the following remarks on page 653 of the opinion:
"It may be that our holding here will require some changes in business methods and will impose a greater burden on the finance companies. We think the buyer  Mr. & Mrs. General Public  should have some protection somewhere along the line. We believe the finance company is better able to bear the risk of the dealer's insolvency than the buyer and in a far better position to protect his interests against unscrupulous and insolvent dealers." *587 See also Buffalo Industrial Bank v. De Marzio, 162 Misc. 742, 296 N.Y.S. 783 (Buffalo City Ct. 1937), reversed on other grounds, Sup., 6 N.Y.S.2d 568 (Sup. Ct. 1937). The position maintained by the court in the Mutual Finance Co. v. Martin decision has been criticized in the case of Implement Credit Corp. v. Elsinger, 268 Wis. 143, 66 N.W.2d 657 (Sup. Ct. 1954) rehearing denied 67 N.W.2d 873 (1955). The Wisconsin Court set forth its reasons for dissension on page 666 of its opinion in 66 N.W.2d:
"We must take cognizance of the fact that a very large percentage of the sales of motor vehicles, farm machinery, electrical appliances, furnaces, and similar articles are made by dealers to their customers on credit, whereby the purchaser makes a down payment in cash or trade-in and gives his negotiable note for the balance secured by a conditional sales contract or chattel mortgage. These notes usually provide for monthly instalment payments extending over fairly long periods of time. Most dealers have not the capital to carry such notes and at the same time replenish their inventory stock so it is customary for them to discount such notes with a finance company or bank. A very considerable segment of our economy is dependent for its continued prosperity upon such free flow of credit, and anything which delays or impedes such process may well be regarded as against the public interest. Finance companies and banks hesitate to purchase such notes, contracts, and chattel mortgages, if executed on printed forms with which they are not familiar, without first submitting them to the scrutiny and opinion of their attorneys. To obviate such delays and expense, these financial institutions have widely adopted the practice of having their own attorneys draft forms of notes, including the indorsements or assignments on the back, chattel mortgages, and conditional sales contracts, and then have had the same printed and supplied to the dealers from whom they customarily purchase customer paper. By so doing such banks and finance companies are better enabled to render prompt service to dealers when they present customer paper for discount because there is no delay occasioned by passing on the forms of the instruments when their own forms have been used by the dealers.
We can perceive of no reason based upon either logic or public policy why a finance company or bank which supplies such blank printed forms should be held thereby to have constituted the dealers their agents, or should be deemed to have participated in the sale by the dealer to the customer, including the execution of any contract, mortgage, or note which the customer may have executed to the dealer. For these reasons, this court does not consider the cases *588 of Commercial Credit Co. v. Childs, supra, and Mutual Finance Co. v. Martin, supra, holding to the contrary on this point should be followed as precedents in this state for we believe them to be based upon an unsound premise,"
This court does not quarrel with these principles. On the other hand, it must be pointed out that the plaintiff-financing company in the Implement Credit Corp. case acted in perfect good faith when it purchased the defendant Elsinger's note and contract, as it was some five months later when it learned for the first time of any fraudulent practices on the part of the vendor, Bierman-Turnacliff, Inc. Furthermore, the Commercial Credit Co. v. Childs, supra, and Mutual Finance Co. v. Martin, supra, cases are not based so much upon an unsound premise as they are decisions striking a balance in favor of a policy which would better protect the buying public, at the expense, perhaps, of slowing the wheels of commerce. The objection voiced in the Implement Credit Corp. opinion is one which essentially disagrees as to where the balance should be struck between the policy favoring consumer protection on the one hand, and the policy fostering prompt service in mercantile transactions on the other. Without expressing an opinion on where the balance should be struck, this court, nevertheless, is impressed by the fact that a financing company that is willing to supply to various vendors negotiable forms containing therein the printed name of the finance company as the specific assignee is necessarily exercising a choice. In such a situation a financing company cannot be unmindful in its choice of vendors of the interest of the buying public. If it is eager to deal with business firms at all, a financing company should not be permitted to choose carelessly, without some investigation of the vendor, or once having had notice of a vendor's unscrupulous tactics, it should not let it pass unnoticed whereby the consumer becomes endangered. See Note, 53 Harv. L. Rev. 1200 (1940). If it has chosen carelessly or has noticed the employment of doubtful business ethics, the financing company *589 should not be allowed to hide behind the holder in due course cloak and thumb its nose at the consumer public. The choice which a financing company exercises should not be a choice devoid of responsibility for its selection.
In the case at bar this court believes that when Rosen approached the defendants and induced them to sign the sales contract with Ideal and the single page conditional sales contract and promissory note containing in bold type the name of Westfield Investment Company as the specific assignee, and secured on the reverse side thereof credit information from the defendants which could only be for, and of use to, the finance company, he was to this extent at least acting as the agent of Westfield. If the signing of the conditional sales contract and the promissory note was not procured, in the final analysis, for Westfield and primarily for it alone, to whom would Ideal have negotiated it? If they attempted to sever or cut off the portion containing the assignment to Westfield, they would of necessity have to destroy, on the reverse side, pertinent credit information for another company. The argument might be advanced that the dealer, rather than sever the assignment, could still negotiate the instrument to another financial institution by striking out the name of Westfield Investment Company from the body of the assignment and inserting the name of the new company. Examination of the assignment demonstrates that the closely printed fine type of that instrument makes such a step physically impossible. Assuming arguendo that it could be done, the financial institution to whom negotiation would then be attempted would be alerted to a situation raising some very pertinent questions in its mind. Faced with a negotiable instrument obviously prepared by Westfield and intended, in the first instance to be negotiated to it, for what reasons did the dealer to whom it was supplied not offer it to Westfield, and if it did, for what reason did Westfield reject it? Was there something about the transaction or the credit of the purchaser which caused either *590 of these steps to be taken? The "free flow of credit" mentioned in the Implement Credit case, supra, would certainly be slowed. The point being made here is that this is not an instrument in blank, but rather an instrument prepared by Westfield and delivered to a dealer selected by it with the desire and intent of both that this particular instrument, after the terms of payment, signatures and other data had been inserted, be returned to and negotiated to Westfield.
The court cannot ignore the fact that reprehensible practices in the sale of these freezers had become generally a matter of public, judicial and legislative concern. Certainly the plaintiff, a dealer in this type of paper, had such knowledge. And let us look at just a few more facets of the case. Ideal was located on Route #23, Wayne, New Jersey. (Incidentally, a few months after this particular transaction it folded up and disappeared, which explains why it is not a party defendant to this action.) Wayne Food is located on Route #23, Wayne, New Jersey. Meatland, who bought the freezer on the repossession sale and told the constable it had supplied the food, is located on Route #23, Wayne, New Jersey. And when Westfield Investment Company, located in Westfield, New Jersey, miles away, decided to repossess, whom did they secure to do the job  a constable, located and operating in the vicinity of the three companies mentioned, who testified with apparent pride that he, a single constable, repossessed and sold 300 to 500 freezers a year. This is again evidence of a prevailing situation which should have served to put the plaintiff on its guard to inquire of its own constable, if he was Westfield's, or of the dealers, or of the defaulting purchasers to discover the reason for these amazing defaults. For these reasons, this court is of the opinion that Westfield Investment Company, not only by its actions and knowledge of the situation prevailing here and in similar freezer deal transactions but also in delivery to its selected dealer of an instrument which, for all practical purposes *591 could be negotiated only to it, became so inextricably a part of the original transaction with the purchaser that it could not thereafter stand aloof in the role of a holder in due course in good faith.
The whole situation leads this court to the conclusion that factually and legally the robe of good faith cannot be draped around the shoulders of Westfield Investment Company. Failing that protection it is subject to the defenses established by the evidence.
Judgment for the defendants.