45922.   GEIGER FINANCE COMPANY v. GRAHAM.

ARGUED JANUARY 13, 1971—DECIDED MAY 13, 1971.

*Baker & Bailey, Kirby G. Bailey,* for appellant.

*S. S. Robinson,* for appellee.

HALL, Presiding Judge. The pleadings showed that a defense existed. Plaintiff therefore had the burden of establishing that it was a holder in due course. *Code Ann.* § 109A-3—307 (3); *Pitillo v. Demetry,* 112 Ga. App. 643 (145 SE2d 792). A holder in due course is one who takes a negotiable instrument in good faith, for value and without notice of any claim or defense against it. *Code Ann.* § 109A-3—302 (1) (c).

The transcript does not clearly indicate the basis upon which the trial court ruled that plaintiff was not a holder in due course, nor is it necessary for our determination of the correctness of the ruling. Plaintiff's contentions all go to lack of notice of a claim or defense on the face of the paper. While the facts here might support a contrary finding, that is not the relevant issue. Plaintiff has overlooked one basic factor in the law of commercial paper—the status of "holder in due course" applies only to the holder of a *negotiable* instrument.

Contrary to the rule in many states,[1] Georgia held this type of contract to be a negotiable instrument under the N. I. L. *Colson & Sons v. Ellis,* 40 Ga. App. 768 (151 SE 654); *Peoples Loan &c. Co. v. Ledbetter,* 69 Ga. App. 729 (26 SE2d 671); *Howard v. Trusco Finance Co.,* 87 Ga. App. 509 (74 SE2d 379). The issue has not been raised since the enactment of the U. C. C., although a footnote in a 1964 case decided under the N. I. L. suggested that conditional-sale contracts would not be Article 3 paper. *Van Norden v. Auto Credit Co.,* 109 Ga. App. 208, 210 (135 SE2d 477). There has been a wholesale market for these contracts because it has been assumed they were negotiable instruments which, after a quick transfer, were impregnable to most defenses the consumer

---

[1] See Anno.: 44 ALR2d 8, 71 §§ 16-18; 11 AmJur2d 56, Bills and Notes, § 34.

would have against the purveyor. Under the umbrella labeled "free flow of commercial paper" have flourished not only legitimate businesses but the most pernicious rackets. The legislature occasionally corrects some of the more apparent abuses. See Ga. L. 1970, p. 441 (Contracts Against Public Policy). However, even assuming ordinary commercial ethics, the effect of such a construction is obvious. "Conditional sales contracts are invariably written by sellers and finance companies for sellers and finance companies. They are often printed in unconscionably small type and presented to the buyer as a mere formality . . . The seller is usually justified in believing either that the buyer will not read the contract at all or will not understand it if he does wade through it. Even were the buyer to read and comprehend the avalanche of legal consequences which would greet any default on his part, . . . on the instalment plan he must sign one conditional sales contract or another, and they are all pretty much alike . . . It is against this background that we must view the plight of [a buyer] who staggers into a contract which could make him liable to pay the full price . . . to a finance company, with which he has not dealt directly, even though the vendor sells him a defective article" (or fails to perform the service). Warren, Tools of Chattel Security Transactions, 1956 Ill. Law Forum 531, 543. "The average citizen, and particularly the financially unimportant, [is] no more likely to know the law of negotiable paper . . . than the holding in Shelley's case." Buffalo Industrial Bank v. De Marzio, 162 Misc. 742 (296 NYS 783, 785).

The question here is whether this kind of paper is a "note" within the definition of the U. C. C. (It is not a draft, check or certificate of deposit—the only other forms of negotiable instrument authorized). *Code Ann.* § 109A-3—104 (1) states that a negotiable instrument is a writing signed by the maker containing "an unconditional promise to pay a sum certain in money and *no other* promise, order, obligation or power given by the maker or drawer except as authorized by this Article." (Emphasis supplied). *Code Ann.* § 109A-3—112 lists certain additional terms which an instrument may contain without affecting its negotiability. The meaning of these two sections read together is clear. If a writing contains any other promise, order, obligation or power, it is simply not a

negotiable instrument and the concept of a holder in due course does not apply.

While the language of the N. I. L. concerning form was similar in many ways, this section of the U. C. C. was specifically intended to be an expansion of the N. I. L. The words "no other . . . obligation or power given by the maker" are new. The intent is that a negotiable instrument carries nothing but the simple promise to pay, with certain limited exceptions. See Comment 3, § 3-104, 1962 Official Text of the U. C. C. By enacting the U. C. C., the legislature contemplated change. The caption reads: "An Act to revise, classify, consolidate and supersede present laws relating to . . . commercial paper . . . and to repeal the present laws relating thereto and establish new laws . . .; to establish definitions of commercial paper." Ga. L. 1962, p. 156.

The writing here cannot meet this new test. Among other things, it grants to the holder powers to waive particular defaults or remedies without waiving others; and to require its written consent for any transfer of the buyer's obligations (while keeping its own freely transferable). It also contains an application for insurance (in effect a grant of authority to the holder to purchase it) and an agreement that the terms of the contract may apply to subsequent sales. It contains a purported waiver by the buyer of "any defense, counterclaim or cross-complaint" he could have asserted against the seller. This goes further than reiterating the rights of a holder in due course since "any defense" would also presumably include infancy, incompetence, discharge in bankruptcy, etc. This is not the type of waiver contemplated by *Code Ann.* § 109A-3—112. Rather, it is an attempt to impart the effect of negotiability to a writing which cannot otherwise meet the test of an Article 3 negotiable instrument.

This standard-form contract, intended for the sale of goods as well as services (just fill in the appropriate blanks) also contains several paragraphs concerning collateral. We will not scrutinize them since no security interest was involved here, but there is little doubt they contain forbidden material. It is interesting that the longest and most complex of the suggested forms for notes does not approach the length of the document here. See U. C. C. Forms § 3-104, Nos. 12, 13 and 14.

We can discover no other state which has faced this identical issue. Many states considered these writings non-negotiable under the N. I. L., so applying the U. C. C. posed no difficulty. See Commerce Acceptance v. Henderson, 446 P. 2d 297 (Okla.); Universal C. I. T. Credit Corp. v. Hudgens, 234 Ark. 668 (356 SW2d 658); Ledman v. G. A. C. Finance Corp., 213 A. 2d 246 (Md.); Atlas Credit Corp. v. Leonard, 15 Pa. D. & C. 2d 292. Many other states have statutes which specifically declare conditional sale contracts to be non-negotiable. A few states by statute provide that the holder of a note based on any consumer transaction takes it subject to all defenses. This is also an important feature of the proposed Uniform Consumer Credit Code. It is, of course, the only real solution to the problem. Even a proper note can be prolix and confusing to the layman, especially one in the grips of a fast-talking salesman. But the courts need not stand impotent while two-page, finely printed "contracts" are circulated as freely as currency. While Justice Gibson's famous "courier without luggage" may be an unobtainable ideal for most notes, allowing him to carry a bag or two does not mean that one who trucks furniture from place to place is a "courier," no matter what else he might legitimately be. The protections offered a holder in due course were evolved by merchants, bankers and lawyers to facilitate the rapid flow of *true* commercial paper. The drafters of the U. C. C. (and our legislature by its adoption) were careful to limit the type of instrument which would carry the powerful magic of negotiability under Article 3. Although theoretically possible, a retail instalment contract, or conditional sale contract, (or a writing of this nature by whatever name) is not usually a note as defined in *Code Ann.* §§ 109A-3—104 through 109A-3—112. Where there is any doubt, the presumption is against negotiability. See Comment 5, § 3-104, 1962 Official Text of the U. C. C.

If a security interest in goods is involved in the transaction, the writing is "chattel paper" and governed by Article 9 and supplementary legislation. For example, the typical automobile transaction would come under *Code Ch.* 96-10 (Motor Vehicle Sales Finance Act) which is cumulative to Articles 2 and 9 of the U. C. C. The writing here involves no security interest. It is, however, exactly what the caption says it is—a retail instalment contract.

In 1967, the General Assembly enacted Code Chapter 96-9 specifically covering retail instalment transactions. It seems clear that in so doing the legislature considered these contracts to be something other than Article 3 commercial paper. Chapter 96-9 does not give holder in due course status to an assignee or transferee of such a contract. Therefore, under simple contract law, he takes it subject to any defenses that could be asserted against the assignor.

In a well known 1953 case, the Supreme Court of Florida made this perceptive statement: "It may be that our holding here will require some changes in business methods and will impose a greater burden on the finance companies. We think the buyer . . . should have some protection somewhere along the line. We believe the finance company is better able to bear the risk of the dealer's insolvency than the buyer and in a far better position to protect his interests against unscrupulous and insolvent dealers." Mutual Finance Co. v. Martin, 63 S. 2d 649, 44 ALR2d 1 (Fla.).

*Judgment affirmed. Eberhardt, J., concurs. Whitman, J., concurs in the judgment.*