# JORGENSEN CHEVROLET COMPANY v. FIRST NATIONAL BANK OF RED WING.[1]

May 19, 1944.

No. 33,686.

*George, Owen & Brehmer,* for appellant.
*Milton I. Holst,* for respondent.

[1]Reported in 14 N. W. (2d) 618.

PETERSON, JUSTICE.

This is an action by the drawer of a check to recover from the drawee the amount of the check debited to the drawer's account after payment thereof upon an endorsement not made by the payee named therein.

The plaintiff is, as its name suggests, a dealer in Chevrolet automobiles, having its place of business in Red Wing. Apparently it also carried some lines of merchandise. Its president is George Jorgensen. It carried an account with the defendant bank.

A corporation bearing the name R.E.S., Inc. was engaged in the electrical construction and sales business in southeastern Minnesota. On June 15, 1942, two representatives of R.E.S., Inc., a Mr. Theodore Quandall and a Mr. Arthur H. Schneider, called on plaintiff to sell it some Westinghouse milk coolers. The negotiations were between Mr. Jorgensen and Messrs. Quandall and Schneider. Throughout the negotiations to be presently mentioned it was apparent to all concerned that Jorgensen represented plaintiff, but Quandall and Schneider did not disclose whom they represented. Jorgensen assumed that they represented the Westinghouse Electric & Manufacturing Company, and, as we shall show, the two men named were aware of this fact, but did not disabuse his mind that the assumption was unwarranted. In fact they represented R.E.S., Inc. The testimony as to what transpired is in conflict.

Plaintiff's version is that Quandall and Schneider gave Jorgensen a circular bearing the name "Westinghouse" prominently displayed thereon and showing a picture of the cooler. The merits of the cooler were fully explained therein. The circular also contained a photostat of what was called the "Westinghouse Commercial Refrigeration Warranty" executed by the Westinghouse Electric & Manufacturing Company, the manufacturers of the coolers. The circular also, in prominent type, summarized the warranty as giving a purchaser "The 5-Year Protection Plan," under which (1) during the first year there was a "standard" warranty on both units and cabinets; (2) during the next four years, replacement of unit without cost if it should fail; and (3) a permanent unit exchange

plan under which after five years units could be exchanged for new ones on an equitable basis. On the outside of the circular in large letters was printed:

"Undivided responsibility. * * * The entire system—cabinet and unit—backed by all the resources, financial stability and reputation of ONE great firm."

Westinghouse is engaged in the manufacture of electrical equipment and the sale thereof through dealers on a nationwide scale. It advertises extensively, and both the company and its products are well and favorably known among the trade. There was nothing on the circular to show that R.E.S., Inc. had anything to do with the sales, although it claimed that it procured the circulars itself.

In the course of the negotiations Quandall and Schneider told Jorgensen that plaintiff was to have the exclusive right to sell the coolers in Red Wing and in certain adjacent territory. After some dickering about prices on time and cash basis, it was agreed that plaintiff should purchase four coolers for the cash price of $1,055, all four coolers to be shipped in one consignment via the Chicago Great Western Railway to Red Wing. Up to that juncture Jorgensen had never heard of R.E.S., Inc., although he knew about Westinghouse, its products, and its reputation. He thought he was dealing with the Westinghouse company. He testified explicitly that he intended to deal with that company and no one else. In closing the deal, Quandall prepared an order for the purchase of the coolers upon the terms stated. In the upper left-hand corner appeared "R E S Inc." Across the top in large type, commanding attention over other matter printed thereon, was printed: "WEST-INGHOUSE PRODUCTS Milk Cooler Department." Jorgensen did not notice the "R E S Inc." printed in the upper left-hand corner. He then made a check in payment of the coolers to close the deal. He did not know the corporate name of Westinghouse and inquired what it was—"Westinghouse who," and they told him "R.E.S. Westinghouse." Thereupon "R.E.S.-Westinghouse" was named as payee in the check. That was the first time Jorgensen had heard of R.E.S.

in connection with Westinghouse or otherwise, and he concluded that the name given him to write as payee was a branch of Westinghouse. On cross-examination he testified:

"Q. When you made out this check you made R.E.S. first, didn't you?

"A. I was going to write Westinghouse, and the check book laid there and I looked up to the fellows and I said, 'Westinghouse what?' and he said, make it 'R.E.S.'

"Q. He told you to make it out to R.E.S.?

"A. He said, 'R.E.S.,' and I said, 'R.E.S. what?' and he said 'R.E.S. Westinghouse.'

"Q. That is the first time you heard that name R.E.S. on this day?

"A. Yes."

Jorgensen testified explicitly and emphatically that he had never heard of or intended to deal with R.E.S., Inc.; that he intended to deal only with Westinghouse; that he thought that he signed a Westinghouse order; that he would have bought the coolers in question only if he got them from Westinghouse; and that he had confidence that the deal was with Westinghouse. After the transaction was closed, Quandall and Schneider gave Jorgensen a business card prominently displaying the name of "RES Inc.," but he paid no particular attention to it.

According to defendant's version, Quandall and Schneider in no way misled Jorgensen as to the fact that they represented R.E.S., Inc. and not Westinghouse, and that Jorgensen, if he had carefully read the order, would have seen "RES Inc." in the upper left-hand corner. It was claimed also that they gave Jorgensen the business card before the deal was closed, not afterward, as testified to by Jorgensen. Quandall categorically denied most of Jorgensen's testimony so far as it related to the latter's claim that he intended to and thought that he was dealing with Westinghouse rather than R.E.S., Inc. Some of Quandall's answers were somewhat equivocal—for example, he qualified his testimony that Jorgensen did not tell him that he (Jorgensen) believed he was doing business with

Westinghouse by the statement "Not to my knowledge," and that Jorgensen "might have" told him that he believed that he was doing business with that concern. Furthermore, he gave without explanation testimony to the effect that, although they were forbidden to use the name "Westinghouse," they had done so in the case of this particular transaction.

Instead of a shipment of four coolers in one consignment via the Chicago Great Western in accordance with the order, R.E.S., Inc. had a drayman in Red Wing pick up an uncrated and damaged cooler in a hardware store in Red Wing and deliver it to plaintiff, which refused to accept delivery. Thereupon plaintiff concluded to look into matters and discovered that R.E.S., Inc. had no connection with Westinghouse except as a sales agency of its products; that plaintiff's check had been endorsed by R.E.S., Inc. and that R.E.S., Inc. had received the proceeds thereof. It discovered also what appeared as facts at the trial, that, although there are separate corporations known as R.E.S., Inc. and Westinghouse Electric & Manufacturing Company, there is no such company as R.E.S.-Westinghouse, and that defendant had paid the check upon the endorsement of R.E.S., Inc.

Plaintiff claimed in the lower court that defendant was not authorized to pay the check upon R.E.S., Inc.'s endorsement. In effect, the jury was instructed that plaintiff was entitled to recover if it intended the check to be payable to R.E.S.-Westinghouse and did not know that there was no such corporation, but that, if it intended to deal with R.E.S., Inc. it was not entitled to recover. The numerous assignments of error in the final analysis raise questions as to the correctness of the instructions.

The argument has assumed that it is the duty of a drawee bank to pay a check only to the person to whom the depositor directs payment to be made, and that ordinarily the bank must ascertain at its peril the identity of the person claiming payment and the genuineness of his endorsement. Likewise, it has been assumed that unless the bank in the instant case was justified in making payment on the endorsement "R.E.S., Inc." it is liable.

■ Of course only the payee named in a check is entitled to receive payment. R.E.S., Inc. is not the payee named. There being no corporation or firm having the name R.E.S.-Westinghouse, the payee named is nonexistent. The rights of the holder of a check payable to a nonexistent payee are governed by N. I. L. § 9, Minn. St. 1941, § 335.052(3), (Mason St. 1927, § 7052[3]), which provides that a negotiable instrument shall be payable to bearer "when it is payable to the order of a fictitious or nonexisting person, and such fact was known to the person making it so payable." If the check in question was payable to bearer within the meaning of the statute, R.E.S., Inc. had the right to endorse it as the holder of bearer paper; otherwise not. It is plain that the test is whether the drawer *knew* that the payee was fictitious or nonexistent. The rule is settled here, as it is elsewhere, that where a check is payable to a nonexisting person and the drawer *does not know* that the payee is nonexistent and intends no fraud, the check is not payable to bearer. City of St. Paul v. Merchants Nat. Bank, 151 Minn. 485, 187 N. W. 516, 22 A. L. R. 1221. The cases are collected in numerous annotations and texts. 22 A. L. R. 1228; 52 A. L. R. 1326; 112 A. L. R. 1435; 118 A. L. R. 15; 7 Am. Jur., Banks, § 601; *Id.,* Bills and Notes, §§ 95-98; 10 C. J. S., Bills and Notes, § 129.

The authorities are emphatic that the test is whether the drawer knew that the payee named was fictitious or nonexistent and intended to make the instrument payable to such a person. "The rule may be said to be that a negotiable instrument or indorsement made to a fictitious person cannot be treated as payable to the bearer and negotiated without indorsement unless the person making it *knows* and *actually intends* to make the instrument payable to a fictitious person." (Italics supplied.) 7 Am. Jur., Bills and Notes, § 95. The maker's intention is the controlling consideration which determines the character of the instrument. Swift & Co. v. Bankers Trust Co. 280 N. Y. 135, 19 N. E. (2d) 992; Seidman v. North Camden Trust Co. 122 N. J. L. 580, 7 A. (2d) 406. In American Exp. Co. v. Peoples Sav. Bank, 192 Iowa 366, 369, 181 N. W. 701, 703, it was aptly said:

"The intent of the drawer is the test, and this intention must necessarily arise from knowledge, and exist as an *affirmative fact* in the mind of the drawer at the time of the delivery of the paper." (Italics supplied.)

Where, as here, a check is payable to a nonexisting corporation and the drawer does not know that the corporation is nonexistent, the check is not payable to bearer. Los Angeles Inv. Co. v. Home Sav. Bank, 180 Cal. 601, 182 P. 293, 5 A. L. R. 1193; Farnsworth v. Drake, 11 Ind. 101; McLaughlin-Gormley-King Co. v. Hauser, 195 Iowa 224, 191 N. W. 880; American Exp. Co. v. Peoples Sav. Bank, 192 Iowa, 366, 181 N. W. 701; Dana v. Old Colony Trust Co. 245 Mass. 347, 139 N. E. 541; Harmon v. Old Detroit Nat. Bank, 153 Mich. 73, 116 N. W. 617, 17 L.R.A.(N.S.) 514, 126 A. S. R. 467.

The plaintiff here had no direct personal dealing with the intended payee. It is undisputed that plaintiff did not intend to contract with either Quandall or Schneider personally. Since a corporation can act only through its officers and agents, neither Westinghouse nor R.E.S., Inc. was or could be personally present during the negotiations. Plaintiff's dealings were with Quandall and Schneider as the agents of a corporate principal which was not present. In such a case, the annotation in 22 A. L. R. at page 1249, says:

"There is a well-defined distinction between cases where the paper is delivered to the impostor as payee, in the belief that he is the person to whom or upon whose indorsement it will be paid, and cases where the paper is delivered to the impostor upon his representation, and in the belief, that he is agent of the person named as payee, although the latter is a fictitious or nonexistent person, or at least a person who has no connection with the transaction; and it is held *with practically no conflict*—at least, in the absence of negligence on the drawer's part—that as between the drawer and drawee, or between the drawer and a holder in due course, the loss falls on the drawee or the purchaser, as the case may be, rather than on the drawer, where the impostor upon whose indorsement the paper was purchased or paid represented himself to be the agent

of the payee, and not the payee himself." (Italics supplied), citing among numerous cases our decision in City of St. Paul v. Merchants Nat. Bank, 151 Minn. 485, 187 N. W. 516, 22 A. L. R. 1221, *supra*.

Since the drawer believed that R.E.S. Westinghouse was an existing payee, which turned out in fact to be fictitious or nonexistent, R.E.S., Inc. did not acquire any right or title to the check and consequently had no right to endorse it. Cohen v. Lincoln Sav. Bank, 275 N. Y. 399, 10 N. E. (2d) 457, 112 A. L. R. 1424.

■ Defendant contends that, in any event, there is here only a mistake as to the name of the payee and that R.E.S., Inc., as the payee erroneously named, had the right to endorse the check, under N. I. L. § 43, Minn. St. 1941, § 335.172 (Mason St. 1927, § 7086), which provides:

"Where the name of a payee or endorsee is wrongly designated or misspelled he may endorse the instrument as therein described, adding, if he thinks fit, his proper signature."

Where the intended payee is incorrectly named, as, for example, where his name is misspelled or abbreviated or, as in the case of corporations, part of the corporate name is omitted, the *intended* payee may endorse the check the same as if it were correctly named. First Nat. Bank v. McNairy, 122 Minn. 215, 142 N. W. 139, Ann. Cas. 1914D, 977. Defendant cites numerous cases to the same effect. A misnomer is immaterial only where no doubt exists as to the identity of the intended payee. Bolles v. Stearns, 65 Mass. (11 Cush.) 320; 10 C. J. S., Bills and Notes, § 129. Only the intended payee is entitled to payment. A corporation other than the one intended but erroneously named as payee is not entitled to payment. Joseph Milling Co. v. First Bank, 109 Or. 1, 216 P. 560, 29 A. L. R. 358. The distinction is observed in the cases. In Atlanta & Lowry Nat. Bank v. First Nat. Bank, 38 Ga. App. 768, 145 S. E. 521, cited by defendant, a check for the purchase price of an automobile purchased from the Stutz Atlanta Motor Company was made payable to the Stutz Motor-Car Company of America, Inc. The court stated the applicable rules of law in accordance with

our views as stated above and held that, since the maker intended that the Stutz Atlanta Motor Company, to whom the check was delivered, should receive payment, it had the right to negotiate the check and receive payment thereof. In Buena Vista L. & S. Bank v. Stockdale, 59 Ga. App. 798, 799, 2 S. E. (2d) 158, 160, it was held that a check payable to "Salem China Company" and intended by the drawer to be payable to an existing, company having that name was not payable to a fictitious payee and could not be nego· tiated by the person to whom it was delivered, citing Atlanta & Lowry Nat. Bank v. First Nat. Bank, *supra*.

■ It has been suggested that, after all, what difference does it make here whether plaintiff intended to deal with Westinghouse and had no intention to deal with R.E.S., Inc., since the last named concern offered delivery of four coolers of the kind ordered. There are deep-seated and fundamental reasons for making the liability of the drawer depend upon the distinction whether he intended to contract with the payee named in the check or someone else. Where he gives a check payable to a fictitious or nonexisting payee, knowing that the payee is of such character, it is obvious that the identity of the payee is of no concern to him. But where the drawer believes that he is contracting with a named payee, who is in fact fictitious or nonexistent, but whom he believes to be one with whom he intends to contract, the identity of the payee may be of the utmost importance and concern to him. The character, stability, reputation, and other attributes of a person or corporation may be the very things that will insure the expected performance. Elder v. Elwell, 175 Minn. 144, 220 N. W. 415; Everson v. J. L. Owens Mfg. Co. 145 Minn. 199, 176 N. W. 505; Holford v. Crowe, 136 Minn. 20, 161 N. W. 213; Fitzpatrick Bldg. Co. v. Healy, 120 Minn. 237, 139 N. W. 495; Boston Ice Co. v. Potter, 123 Mass. 28, 25 Am. R. 9; Annotation, L. R. A. 1916D, 801; 1 Williston, Contracts (Rev. ed.) § 80. The reasons given have application here. In Winchester v. Howard, 97 Mass. 303, 93 Am. D. 93, the court held that a purchaser of oxen from one in possession may revoke the contract upon discovering that the oxen in fact belonged to another with whom

he did not choose to deal, where the seller represented that the oxen belonged to him. In School Sisters of Notre Dame v. Kusnitt, 125 Md. 323, 93 A. 928, L. R. A. 1916D, 792, where the buyer of merchandise was misled by the seller to believe that it was dealing with the Goodyear Rubber Company, a large corporation of good reputation doing a nationwide business, when in fact the seller was an individual doing business as Goodyear Hospital Rubber Company, the court held that there was no contract because there was no assent by the buyer to a contract with the party with whom it negotiated. In Cundy v. Lindsay, 3 L. R. App. Cas. 459, 6 Eng. R. C. 211 (cited in Everson v. J. L. Owens Mfg. Co. 145 Minn. 199, at p. 203, 176 N. W. 505, at p. 507), title to merchandise was held not to pass where the sellers were misled by one Blenkarn to believe it was dealing with a respectable, well-established firm having the name Blenkiron. Lord Cairns said:

"* * * Of him [Blenkarn] they [the sellers] knew nothing, and of him they never thought. With him they never intended to deal. Their minds never, even for an instant of time rested upon him, and as between him and them there was no *consensus* of mind which could lead to any agreement or any contract whatever."

It makes no difference in such a case that the person with whom the buyer is misled to contract is able to and offers to deliver the identical goods contracted for. A buyer has the right to choose not only the goods he purchases, but the seller of the goods also. Winchester v. Howard, 97 Mass. 303, 93 Am. D. 93; Barcus v. Dorries, 64 App. Div. 109, 71 N. Y. S. 695.

Here, it was important to plaintiff whether it dealt with Westinghouse or someone else, not only for the reasons given but also because the warranty given by Westinghouse was for the benefit of the "original purchaser" only. Just how plaintiff could have the benefit of the warranty as to goods purchased from others than Westinghouse, as, for example, from R.E.S., Inc., especially the cooler taken out of a local hardware store, does not appear. Plaintiff was entirely within its right in refusing to accept delivery

from R.E.S., Inc. of the coolers it intended to buy from Westinghouse. Otherwise R.E.S., Inc. could foist itself upon plaintiff although plaintiff would not deal directly with that company.

Our conclusion is that the evidence is in conflict whether plaintiff intended to deal exclusively with Westinghouse or R.E.S., Inc., and that the determination of that question was a fact issue for the jury. If plaintiff's version is true, as the jury could find, Quandall and Schneider knew that Jorgensen was laboring under the impression, produced by their furnishing him with the Westinghouse circular and the negotiations between them, that plaintiff was contracting with Westinghouse. They knew that he had an erroneous impression as to whom they represented. In that situation, it was their duty when he inquired about the Westinghouse name, so he could name it as payee in the check, to disclose to him that he was dealing with R.E.S., Inc. Instead of making the disclosure and thus disabusing his mind of his error, they took affirmative measures to prevent him from discovering his error and to conceal their identity by telling him that the check should be payable to R.E.S. Westinghouse. Such conduct is fraudulent. See 3 Dunnell, Dig. & Supp. § 3823. Of course Quandall and, to a certain extent, Schneider deny plaintiff's version. But it was for the jury to say which version was true. The finding that plaintiff intended to deal exclusively with Westinghouse is sustained by the evidence. Consequently, the endorsement of the check by R.E.S., Inc. transferred no title, and plaintiff is entitled to recover.

Affirmed.

MAGNEY, JUSTICE (dissenting).

In my opinion, the facts here present just such a situation as was contemplated in N.I.L. § 43, Minn. St. 1941, § 335.172 (Mason St. 1927, § 7086), which reads:

"Where the name of a payee or endorsee is wrongly designated or misspelled he may endorse the instrument as therein described, adding, if he thinks fit, his proper signature."

The contract entered into between plaintiff and R.E.S., Inc. is as follows:

"WESTINGHOUSE PRODUCTS
Milk Cooler Dept.

R E S
  Inc.
Minneapolis, Minn.

[Body of Order]

R.E.S., INC.

  By *A. H. Schneider* Purchaser's Signature *Geo. Jorgensen*"

The order does not mention "Westinghouse Corporation" or "Westinghouse Electric & Manufacturing Co." It clearly states "Westinghouse Products," which was a correct designation of what R.E.S., Inc. was selling or distributing. There was nothing misleading in those words. In the upper left-hand corner "R E S Inc." is printed in letters twice as large and in bolder type than the words "WESTINGHOUSE PRODUCTS." Underneath "R E S Inc." we find the words "Minneapolis, Minn." In the lower left-hand corner we find "R.E.S., INC. by *A. H. Schneider.*" There is nothing on the face of this contract that is misleading and nothing to indicate that the Westinghouse corporation was a party thereto. It is clear from the contract itself that Jorgensen and R.E.S., Inc. were the sole parties to the contract for the sale and purchase of a Westinghouse product.

Quandall, the sales manager of R.E.S., Inc., and Schneider, one of its salesmen, negotiated the contract. A price had been agreed upon. Jorgensen asked for a discount if he paid cash. Thereupon Quandall and Schneider agreed to a $25 discount. After the contract had been executed by both parties, Jorgensen asked how the check should be made out. At the trial, he was asked: "He told you to make it out to R.E.S.?" and he answered: "He said, 'R.E.S.,' and I said, 'R.E.S. what?' and he said 'R.E.S., Westinghouse.'" Jorgensen then wrote in "R.E.S. Westinghouse" as the payee.

Jorgensen claims that it was his intention to deal only with the Westinghouse corporation and that he had no intention of dealing with R.E.S., Inc. He was asked:

"Q. You speak of Westinghouse order. Do you know of any concern named Westinghouse?

"A. Just the trade name.

\* \* \* \* \*

"Q. And you knew when you saw this order R.E.S. was on it when you signed it?

"A. It wasn't very distinct on there, Westinghouse is more predominant than R.E.S.

"Q. Will you examine it? Do you see some is in heavier type than other?

"A. It is in a bolder type."

There is no claim by Jorgensen that the representatives of R.E.S., Inc. made any oral misrepresentations to him aside from the claimed misrepresentation in connection with filling in the name of the payee when drawing the check. He does claim that the descriptive literature gave him the impression that he was dealing directly with Westinghouse, the manufacturing concern, especially the facsimile of the manufacturer's guaranty. Jorgensen is a Chevrolet distributor. He hands out Chevrolet literature to his prospective customers, prepared and furnished by the manufacturer, and that undoubtedly contains the usual manufacturer's guaranty. It is fair to assume that no purchaser of experience, as Jorgensen here is, would ever consider that he was dealing directly with the makers of Chevrolet when purchasing a car. He was asked:

"Q. You knew they represented some concern that had the name 'R.E.S.' in it, didn't you?

"A. If you are speaking like you were in the Chevrolet business, it is nothing to write a check out to these big corporations, and they have subsidiaries and when he said 'R.E.S.' I thought, 'Well, hell, it is a branch of Westinghouse.'

"Q. Or a subsidiary?

"A. Or branch or something.

"Q. Somebody that had some connection?

"A. Some direct connection, part of the parent concern or company."

When he wrote "R.E.S." as part of the name of the payee, it is not understandable to me how he can claim that he thought he was writing a check payable to the Westinghouse corporation.

Jorgensen signed a sales contract with R.E.S., Inc. and delivered a check to the agents of R.E.S., Inc. in payment for products ordered from that company. The name of the payee was inserted as "R.E.S.-Westinghouse." Plaintiff's version as to how this came about has been ·stated. The check was endorsed by R.E.S., Inc. and payment made by defendant to that corporation. Plaintiff's intention as expressed in the written contract was carried out, and plaintiff should not now be permitted to shift to defendant a loss due to what turned out to be an unsatisfactory deal. The same party Jorgensen gave the check to cashed it. He gave the check to the party he signed a contract with. The endorsement was in fact made by the payee, which had been misdesignated. The payee was not nonexistent, but wrongly designated.

In my opinion, "the impostor cases" cited are of no application. From my impression of the evidence, R.E.S., Inc. was not pretending to be Westinghouse, but was acting solely as a dealer or distributor of its products. Quandall and Schneider were not impostors, but the authorized agents of R.E.S., Inc., the intended and misdescribed payee.

For the above reasons, I respectfully dissent.

LORING, CHIEF JUSTICE (concurring in dissent).
I concur in the dissent.

JULIUS J. OLSON, JUSTICE (concurring in dissent).
I concur in the dissent of Mr. Justice Magney.