Erle G. SWANSON and Helen F. Swanson, husband and wife, Plaintiffs,

v.

The FULINE CORPORATION, a Missouri corporation, and Commercial Acceptance Corporation, a Missouri corporation, Defendants.

Civ. No. 64–84.

United States District Court
D. Oregon.

Dec. 27, 1965.

Denton G. Burdick, Jr., Hutchinson, Schwab & Burdick, Portland, Or., for plaintiffs.

Milton C. Lankton, Black, Kendall, Tremaine, Boothe & Higgins, Portland, Or., for defendant Fuline.

Guy J. Rappleyea and Borden F. Beck, Jr., Black & Apicella, Portland, Or., for defendant Commercial Acceptance Corp.

EAST, District Judge.

## ISSUES

The plaintiffs above named (Swansons) in these proceedings seek to rescind:

1) A certain "Fuline franchise agreement" dated May 1, 1962, issued by the defendant The Fuline Corporation, a Missouri corporation (Fuline) to Swansons, providing for and "contemplating" that Swansons would purchase from Fuline hot drink dispensing machines and maintain and operate the same in the "Portland, Oregon, and surrounding areas," and

2) The hereinafter described two promissory notes and the two securing chattel mortgages covering 40 dispenser machines in one and 20 in the latter, purchased by Swansons from Fuline under the franchise (notes and mortgages), executed by Swansons in the State of Washington and delivered by Swansons to Fuline, the original payee and mortgagee, at Kansas City, Kansas, as part of the purchase price of the 60 dispenser machines, which notes and mortgages are now held by the defendant Commercial Acceptance Corporation, a Missouri corporation (Holder); and further, to recover judgment against Fuline and Holder for some $8,000.00, being money paid on accruing monthly installments of principal and interest on the notes.

Swansons premise and claim as a basis for rescission and judgment is alleged breach of warranty on the part of Fuline of fitness of the 60 dispenser machines for the purpose for which Swansons purchased the same from Fuline.

Holder has counterclaimed against Swansons for judgment upon the accelerated unpaid balance of the principal and interest of the notes and a foreclosure of the mortgages under the premise and claim that it is a (bona fide purchaser for value) holder of the notes in due course without notice of any defects, and therefore any defenses Swansons may claim against the enforcement of the two notes by the original payee, Fuline, is not available to Swansons as against Holder. Section 57, The Negotiable Instrument Law (N.I.L.).

Swansons deny that Holder is a holder in due course of the notes, and assert that Holder is a bare holder of the notes and its rights as such are not greater

than those of the original payee Fuline, and are subject to Swansons' defenses to the enforcement of payment of the notes as they may have against Fuline. Section 58 N.I.L. (identical with O.R.S. 71.058.) [1] Swansons premise for their denial of Holder's status as a holder in due course is that:

(a) The two notes held by it are not regular on their face in that there is no endorsement thereof by Fuline (the payee) to Holder, and there is no assignment of the securing mortgages by Fuline (the mortgagee) to Holder which could in anywise constitute a transfer of the two notes, and

(b) The purchase of the dispenser machines by Swansons and the execution of and delivery of the purchase money notes and mortgages by Swansons to Fuline, and Holder's commitments prior to any purchase of the dispenser machines by Swansons to purchase the notes with their securing mortgages, was in fact a "three party transaction" in which Holder actually participated and it did not act in the transaction and took the notes in "good faith." Section 52 N.I.L., subsections (1) and (3), *infra*.

By stipulation of counsel for all parties and order of the Court "Issues numbered 1 and 2, respectively, of the pretrial order herein were segregated for trial and adjudication prior to the trial of the remaining issues * * *."

Issues 1 and 2 of the pretrial order read as follows:

"1. Is defendant Commercial Acceptance a 'holder' of the above referred to promissory notes dated June 12, 1962, and June 28, 1962, respectively?

"2. Is defendant Commercial Acceptance a 'holder in due course' of the above referred to promissory notes dated June 12, 1962, and June 28, 1962, respectively?"

(Here follows a series of 17 questions of fact to be answered by the Court, omitted from this decision for the purpose of conciseness.) Swansons' counsel's brief concedes that Holder is " * * * a holder" of the notes within the provisions of § 51 N.I.L. (identical with O.R.S. 71.051), and I deem that issue resolved.

### FINDINGS OF FACTS

As for the factual record on the segregated issues, the Court has the agreed facts in the pretrial order, counsels' stipulation of testimony, and the documentary evidence received in evidence.

For the purpose of the segregated issues, I find that:

"On or about April 27, 1962, plaintiffs made written application to the defendant Fuline for a Fuline Franchise, and made a deposit of $200.00 to defendant Fuline on account thereof."

On April 30, 1962, Fuline delivered to Holder a copy of Swansons' application for franchise; a copy of the verification of the United States National Bank of Portland, Oregon, that Swansons had on deposit with the bank the sum of $7,000.00; and a copy of Fuline's "Request for Financing" involving 40 dispenser machines to be purchased by Swansons, which "Request for Financing" was thereafter noted "4–30–62–OK" by an officer of Holder, and on that date Fuline was advised that the request for financing had been approved by Holder.

On or about May 1, 1962, Swansons and Fuline entered into the mentioned franchise agreement.

On or about June 12, 1962, Swansons purchased 40 of the dispenser machines, making a down payment, and, as part payment of the purchase price, executed in the State of Washington and delivered to Fuline in the State of Kansas:

(a) Their written promissory note in the principal amount of $23,871.24,

---

1. All Ch. 71 sections of O.R.S. cited herein were in full force and effect during all of the pertinent times involved in Issue 2. These sections have since been repealed by the adoption by the Oregon Legislature of the Uniform Commercial Code.

payable to the order of Fuline "1401 Fairfax Rd.—Kansas City, Kansas," in equal monthly installments, commencing July 27, 1962, and

(b) Their mortgage covering the 40 machines so purchased, as security for the payment of the note.

The note and mortgage of June 12, 1962, was upon a form supplied by a "Commerce Acceptance Company, Inc.," a Missouri corporation (Commerce), and were attached together on the same piece of paper or form.

On or about June 28, 1962, Swansons purchased 20 of the machines, making a down payment, and, as a part payment of the purchase price, executed in the State of Washington and delivered to Fuline in the State of Kansas:

(a) Their promissory note and mortgage of like terms and tenor and on forms identical with their note and mortgage of June 12, 1962, except the principal amount was $11,935.44, and the equal monthly installments were to commence August 12, 1962.

Late in May, 1962, Fuline had made telephone request of Holder to add an additional 20 dispenser machines to its earlier expressed approval of the request for financing 40 such machines upon substantially the same terms, and Holder gave telephone approval of this request.

Each of the notes, on the reverse side thereof, bears prepared printed forms of "without" and "on" recourse endorsements thereof. The "on recourse" endorsement reads:

"On Recourse Transactions Dealers Endorse Below:

For value received, pay to the order of Commerce Acceptance Company, Inc." (Here follows terms of endorsement and waiver of endorsers' rights, not in issue here.)

Each of the mortgages bears a prepared printed form of assignment thereof which reads:

"For value received, the within chattel mortgage and all the right, title and interest of the undersigned seller therein and thereunder, and the property therein described and secured, herewith submitted for purchase by it, is hereby sold, transferred, conveyed and assigned to Commerce Acceptance Company, Inc., its successors and assigns, * * *." (Here follows terms of assignment and authority to assignee, not in issue here.)

Subsequent to the execution and delivery of the notes and mortgages, and prior to July 9, 1962, Fuline executed:

(a) The printed "on recourse transactions" endorsement on each of the notes, and

(b) The printed assignment on each of the mortgages, and

delivered the notes and mortgages to the actual possession of Holder, "which purchased the said notes and chattel mortgages from Fuline by giving value therefor to Fuline at the times of their respective purchase by (Holder)," and has " * * * at all times since such respective purchases and deliveries of said (notes and mortgages to Holder) been and is in possession of said (notes and mortgages)."

" * * * Fuline is a totally separate and distinct corporate entity from (Holder), with neither corporation owning any interest in the other and there does not now exist, nor has there existed, any common director or officer of the two corporations."

Holder is engaged in the business of purchasing commercial paper, and during the three-year period prior to the Swansons' transaction had purchased from Fuline some 23 accounts, totaling some $391,000.00, and from all sources similar commercial paper totaling in excess of $3,100,000.00.

"At no time prior to the agreement between Fuline and (Swansons) for the purchase and sale of the equipment involved herein, and at no time prior to the purchase of the above referred to notes and chattel mortgages by (Holder) from

Fuline, did (Holder) counsel, consult with, or have any direct dealing with (Swansons) or in any way make any representation to (Swansons) regarding said equipment."

Fuline's negotiations for and decision to sell equipment to Swansons, and Fuline's acceptance of the purchase price notes and mortgages, together

" * * * with the other terms and conditions of the purchase and sale, (were) made solely by Fuline upon its own responsibility and not subject in any respect to the control of (Holder)."

As recited in the printed forms, the actually named endorsee of the notes and assignee of the mortgages was Commerce. "(Commerce) was and is a corporation which is the owner of 100% of the stock of (Holder)" and while Commerce and Holder have a common officer, one Hutcheson, they are separate legal entities engaged in separate business."

"At no time did (Commerce) (a) purchase or agree to purchase from Fuline the notes and chattel mortgages above referred to, (b) pay or give, or agree to pay or give, to Fuline any consideration whatsoever in payment for said notes and chattel mortgages, or (c) receive possession of said notes and chattel mortgages * * *"

nor did Swansons, Fuline, Holder, or Commerce contemplate or intend that the notes and mortgages were to be purchased and transferred to Commerce.

Swansons paid directly to Holder:

(a) On the note of June 12, 1962, monthly installments in the amount of $663.09 for each of the months of July, August, October, and December 1962; and

(b) On the note of June 28, 1962, monthly installments in the amount of $331.54 for each of the months of August, September, October, and December, 1962, and February and March, 1963.

And in making those payments Swansons

" * * * continued to make payments to (Holder) of the installments due under the (notes) after (Swansons) became aware of the matters upon which (they) base their contention that 'the machines * * * were faultily constructed * * *.'"

Swansons defaulted in the payment of subsequent installments on the notes and, prior to the institution of this action by Swansons and the filing of Holder's counterclaim, Holder notified Swansons

" * * * that it had exercised its option contained in said notes and mortgages to declare the entire balance due on each of the same immediately due and payable; that (Swansons) had failed and refused to pay any further amounts on said notes and mortgages and the balance due and payable thereon, if the same are enforceable against (Swansons), are as follows: * * *." (Here follows amounts alleged unpaid, of which there is no issue.)

At no time prior to Holder's purchase of the notes and the securing mortgages and the endorsement, assignment, and delivery of the notes and mortgages by Fuline, as aforesaid, was Holder "aware of any defect in the title of Fuline to the notes" or aware of any defense in favor of the Swansons to the promise of payment contained in the notes.

Subsequent to the commencement of these proceedings, Fuline executed and delivered to Holder various "Corrected Assignments," "Correction, Clarification and Amendments of Corrected Assignment" documents setting forth the averred erroneous and inadvertent designation of Commerce as endorsee and transferee of the notes and mortgages, respectively, rather than Holder as the intended transferee. Commerce either "acknowledged" or was a party to each of these documents. Swansons are strangers to these documents.

## CONCLUSIONS OF FACT

From the foregoing findings, I conclude:

(a) That the naming and designating of Commerce as endorsee of the notes and transferee, or assignee, of the mortgages was due to the mutual mistake and inadvertence of Fuline and Holder;

(b) That it was the mutual understanding and intention of Swansons (as makers of the notes and mortgages), Fuline (as original payee of the notes and mortgagee in the mortgages), and Holder, that if Holder did purchase the notes from Fuline the notes and their securing mortgages were to be transferred to Holder on proper endorsements and assignments by Fuline;

(c) That Commerce has never had and does not now have any interest in or legal claim to the notes and their securing mortgages; and

(d) That the mistake and inadvertent endorsement of the notes and transfer of the mortgages by Fuline to Commerce has not caused any change of Swansons' position as makers or otherwise worked to their additional loss or prejudice.

Swansons suggest that for Holder to assume the status of a holder in due course upon improper endorsement would be inequitable. I might suggest that it would likewise be inequitable to hold one bound to a contract that was not mutually agreed upon by the parties thereto. The law merchant is harsh, but still it only enforces mutual agreements.

## CONFLICTS OF LAW

Swansons urge that the law of Oregon applies in determining Holder's status as a holder of the notes in due course in that Oregon is the situs of this forum and the present situs of the machines covered by the mortgages sought to be foreclosed.

Holder urges that there are three, and only three, states with any possible connection with the transactions involved in determining Holder's status:

(a) Missouri ("place of endorsement of the notes and assignment of the mortgages respectively (sic) and delivery of the notes and mortgages by Fuline to Holder");

(b) Washington (place of execution of the notes and mortgages by Swansons); and

(c) Oregon.

To this I would add the State of Kansas (the apparent place of the inadvertent endorsement of the note and assignment of the mortgages by Holder to Commerce, also the place of payment of the notes).

However, since all of the mentioned states had adopted the N.I.L. and the adopting statutes of the respective states were in full force and effect during all the pertinent times involved in Issue 2, I decline to deal with any conflicts-of-law issue.

## APPLICABLE N.I.L. LAW

Section 52 of N.I.L., identical with Oregon Revised Statutes (O.R.S.) 71.-052; Revised Code of Washington (RCWA) 62.01.052; Vernon's Annotated Missouri Statutes (V.A.M.S.) 401.052; and Kansas Statutes Annotated (K.S.A.) 52.502 reads:

"Sec. 52. *What constitutes a Holder in Due Course.*

A holder in due course is a holder who has taken the instrument under the following conditions:

(1) That is complete and regular upon its face;

(2) That he became the holder of it before it was overdue, and without notice that it had been previously dishonored, if such was the fact;

(3) That he took it in good faith and for value;

(4) That at the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

Section 57 N.I.L., identical with O.R.S. 71.057; RCWA 62.01.057; V.A.M.S. 401.057; and K.S.A. 52.507; reads:

"Sec. 57. *Rights of Holder in Due Course.*

A holder in due course holds the instrument free from any defect of title of prior parties, and free from defenses available to prior parties among themselves, and may enforce payment of the instrument for the full amount thereof against all parties liable thereon."

Section 43 N.I.L., identical with O.R.S. 71.043; RCWA 62.01.043; V.A.M.S. 401.043; and K.S.A. 52.414; reads:

"Sec. 43. *Indorsement Where Name is Misspelled, Etc.*

Where the name of a payee or indorsee is wrongly designated or misspelled, he may indorse the instrument as therein described, adding, if he think fit, his proper signature."

### APPLICABLE N.I.L., TEXT, AND CASE LAW

Swansons make no claim or issue that Holder fails to qualify as a holder in due course under either subsections 2 or 4 of § 52 N.I.L. Therefore, it remains to be determined whether Holder is disqualified as a holder in due course under the prerequisites of such status as outlined in subsections 1 and 3 of § 52 N.I.L.

I deal first with Swansons' premise and claim that the entire transaction among Swansons, Fuline and Commerce was a "three party transaction" and Holder thereby did not take the notes in "good faith," as required by subsection 3, supra. A perusal of the authorities cited by Swansons reveals an entirely different factual bottom than that presented in these proceedings, because in each of the cited cases the transferee of the notes had actively participated in the basic transaction forming the consideration for the note involved. Furthermore, if my interpretation of those factual bottoms is faulty and any of the authorities cited by Swansons can be read to support their premise and claim of lack of "good

faith" on the part of Holder, whose sole participation in the transaction between Swansons and Fuline was to give a commitment that it would, if offered, purchase the notes and their respective securities, such authority is overcome by the weight of reasoned authority in the United States. Swansons rely heavily upon United States v. Klatt, 135 F.Supp. 648 (S.D.Cal.1955). A study of Klatt reveals that it has no application to our problem, for in Klatt the Court was dealing with a note that had been secured by fraud in execution and a forged corporation certificate (required by the National Housing Act). The endorsee Bank of America was held to be "charged with notice that it could not properly discount the note at bar until furnished with a 'corporation certificate signed by the borrower (maker).' * * the bank took the note with knowledge of defects, and did not, therefore, become a holder in due course * * *." The case goes further and holds:

" * * * that the relationship between the payee (of the note) * * and the bank, as to the entire transaction giving rise to the instrument, was such that the bank must be considered in effect a party to the original transaction between the named-payee dealer and the (maker) * * *; and the bank could not, therefore, in any event, be deemed a holder in due course of any negotiable instrument executed as part of the transaction." (Citing cases cited by Swansons and above dealt with.) p. 650.

The recital of the facts involved in Klatt does not reveal what the participation of the bank in the original transaction was, so, since the case cites authorities wherein the endorsee was found to have actively participated in the original transaction, I assume that was the situation in Klatt, as opposed to a mere prior commitment on the part of the bank to finance the transaction by a purchase of the notes after execution, furnishing of forms, prior transaction, etc., as is the situation here.

 I am satisfied that in order to show a lack of "good faith" [2] on the part of an endorsee, there must be facts showing actual and direct participation by the endorsee in the original transaction between the maker and the original payee of the note, as distinguished from an endorsee's mere furnishing of forms of notes and mortgages (being attached on the same sheet of paper), reviewal of the maker's financial statement, dealings of prior transactions, and prior commitment to purchase or discount, as a part of the endorsee's regular course of business as a financial institution, being separate and apart from the makers and the original payee's regular business. All this is taught by the following sound authorities: Implement Credit Corp. v. Elsinger, 268 Wis. 143, 66 N.W.2d 657, 67 N.W. 2d 873 (1954); James Talcott, Inc. v. Shulman, 82 N.J.Super. 438, 198 A.2d 98 (1964); Universal C.I.T. Credit Corp. v. Alker, 239 La. 1057, 121 So.2d 78 (1960); New Jersey Mortgage & Investment Corp. v. Calvetti, 68 N.J.Super. 18, 171 A.2d 321 (1961). See also Barnard, Phillips Factors, Inc. v. Kaplan Silk Corp., City Ct., 28 N.Y.S.2d 696, aff'd, 28 N.Y.S.2d 699 (1941).

 I conclude that Holder did not "actively participate in the transaction" between Swansos and Fuline to the extent that it became a party to their transaction and that Holder did not otherwise lack "good faith" in taking the notes, as required by subsection 3, supra.

I now approach and deal with the requirement of subsection 1, supra. As above found and concluded, Holder, as the actual and intended endorsee of the note, was " * * * wrongfully designated * * * " [3] and therefore our inquiry is resolved by determining the proper judicial interpretation of § 43, supra, where a "wrongfully designated" endorsee is involved.

11 Am.Jur.2d, Bills and Notes, § 352, pp. 372–3, cites § 43 and advises us:

> "Thus, where the name of an intended payee is misspelled or abbreviated or, as in the case of corporations, part of the corporate name is omitted, the intended payee may indorse the same as if he were correctly named. Also, a draft drawn on a printed form in favor of a bank which had previously consolidated with other banks to form a new one under a new name, where the drawer had inadvertently failed to use the rubber stamp customarily used for substituting the name of the consolidated bank, was not required to be indorsed in the name of the payee wrongly designated.[3] * * * However, indorsement in a name other than that by which the payee is described is authorized only if the indorser is the payee to whom the drawer intended it should be payable, there being a wrong designation or misspelling through mistake or inadvertence.[4] * * * "

A review of the case law cited in footnotes 3 and 4 of the above Am.Jur. section reveals that the text is fortified with sound judicial analysis and expression.

First Wisconsin Nat. Bank of Milwaukee v. People's Nat. Bank of Rocky Mount, Va., 136 Va. 276, 118 S.E. 82, at p. 83, 36 A.L.R. 736, at p. 739 (1923), cited in n. 3, tells us:

> "Under the circumstances here appearing, it is perfectly apparent that the failure to make the draft payable to the plaintiff bank is a mere inadvertent clerical error, because the bank to which it was made payable had been out of existence for nearly 12 months,—that is, since June 30, 1919, the effective date of the consolidation."

---

2. Of course, authorities are legion to the effect that a transferee's participation in a fraud or knowledge of a fraud practiced upon the maker of a note would constitute a lack of "good faith" on the part of the transferee.

3. Or, in the alternative, a stranger to and an unintended endorsee in a note, Commerce, was "wrongfully designated."

■ We can just as well say here that the wrong designation of Holder, which was the intended endorsee, was "a mere inadvertent clerical error, because the (financial institution) to which it was made payable * * *" was an utter stranger to the whole transaction among Swansons, Fuline and Holder and the mutual understandings and intentions of those parties.

As here presented, so it was in First Wisconsin Nat. Bank, supra, p. 739, 118 S.E. p. 83:

"It was to the plaintiff bank that the draft was delivered by the drawer, and this bank discounted it. It was from the plaintiff bank that the drawer received cash credit for the amount of the draft, to whom the draft as well as the bill of lading was delivered, having been indorsed by the Grain Company. If attention had been drawn to this clerical error, the plaintiff bank would have had the right to avoid it, for Code, § 5605 (Negotiable Instruments Law), provides expressly: * * *."
(Here quoting § 43 N.I.L.)

See also First State Bank of Humbird v. Cox, 192 Wis. 566, 213 N.W. 290 (Wis. 1927), where the note involved was endorsed over to "* * * Wisconsin Limestone Company, instead of 'West Wisconsin Lime Company' * * *" In dealing with § 43 N.I.L., the Court opined, at p. 291, at p. 291 of 213 N.W.:

"Besides, even if the indorsement were held to be defective, the holder could compel a proper endorsement."
(Citation.)

Jorgensen Chevrolet Co. v. First Nat. Bank of Red Wing, 217 Minn. 413, 14 N.W.2d 618, 153 A.L.R. 588 (1944), cited in n. 4, supra, soundly advises us, with reference to § 43 N.I.L., that:

"A misnomer is immaterial only where no doubt exists as to the identity of the intended payee." (Citations.) 14 N.W.2d 618, at p. 622, 153 A.L.R. 588, at p. 594.

"Where the intended payee (endorsee) is incorrectly named, as, for example, where his name is misspelled or abbreviated or, as in the case of corporations, part of the corporate name is omitted, the *intended* payee may endorse the check the same as if it were correctly named." (Citations.) 14 N.W.2d 618, at p. 622, 153 A.L.R. 588 at p. 594.

"Only the intended payee is entitled to payment. A corporation other than the one intended but erroneously named as payee is not entitled to payment. Joseph Milling Co. v. First Bank of Joseph, 109 Or. 1, 216 P. 560, 29 A.L.R. 358 * * *" 14 N.W.2d 618, at p. 622, 153 A.L.R. 588 at p. 594.

In Joseph Milling Co., supra, Justice Harris of the Oregon Supreme Court tells us, 109 Or. at pp. 16 and 17, 216 P. at p. 565, that:

"The plaintiff was indebted to the 'Claremont Storage Warehouse, Inc.'; * * * (warehouseman) and for the purpose of making a payment on that indebtedness the plaintiff mailed to (warehouseman) at the proper street and city and state address of the warehouseman, a check payable to 'Clearmount Storage Co.' If the name written in the body of the check be treated as a misnomer, and not as a mere abbreviation, the check was nevertheless *intended for the warehouseman,* and was one upon which the warehouseman in the attending circumstances was entitled to payment by the bank. 14 C.J. 324."

Counsel for Swansons so strongly urges that First Nat. Bank v. McCullough, 50 Or. 508, 93 P. 366, 17 L.R.A., N.S., 1105 (1908) is controlling and decisive of our problem that I feel constrained to discuss it. I cannot read McCullough as does counsel. McCullough was dealing with the plaintiff bank's attempt to enforce payment of McCullough's farm rental note, made payable to one "Furnish," who endorsed the note over to one "Moody," who in turn endorsed the note "pay A. B. Nixon or order * * *" There was no en-

dorsement by Nixon to plaintiff bank. Nixon was in truth and fact at the time of the endorsement to him cashier of plaintiff bank. The Court rejected plaintiff's contention that because Nixon was in truth its cashier, the note should be "deemed prima facie to be payable to the * * *" plaintiff bank pursuant to the provisions of § 42 N.I.L., identical with O.R.S. 71.042. The Court's recital of the facts of the case does not advise us whether it was Nixon or plaintiff bank who actually purchased and paid value for the transfer from Moody or who was the "intended" endorsee—Nixon or plaintiff bank. There can be no question but that Joseph Milling Company, supra, demands of us that we ascertain the intention of the parties here. In McCullough, the trial court struck "* * * Moody's testimony to the effect that the notes in question were endorsed to the plaintiff * * *" bank and the reviewing court approved. Since Moody's testimony was "* * * not on the ground of establishing a right in the plaintiff (such as an inadvertent mistake of endorsee's designation, establishing the identity of the intended endorsee who had paid value as is here present) to maintain an action in its corporate name (to enforce payment of the note from maker), but to prove that (plaintiff) was an indorsee, in due course * * *"

All that McCullough can be read for is its holding to the effect that

"The note sued on having been delivered by Nixon, without indorsement, to the plaintiff, the bank was authorized to maintain an action thereon in its own name; but it took and held the paper subject to all equities existing in favor of the makers, * * *" at p. 515, 93 P. at p. 369.

Joseph Milling Company, supra, takes from Swansons any solace they might claim from McCullough.

## CONCLUSIONS OF LAW

I conclude that Holder is a holder in due course of the notes and the securing

mortgages and as such takes and holds the notes and their securing mortgages free from any defenses the Swansons may have against collection of the notes by the original payee Fuline.

The parties have stipulated in Item 25 on page 9 of the pretrial order as to the amount of judgment and for foreclosure of the securing mortgages:

"* * * if defendant (Holder) is a holder in due course of the * * * notes."

Accordingly, I conclude that Holder is entitled to judgment against Swansons and foreclosure and order of sale of their respective securing mortgages, as stipulated in the mentioned Item 25 of the pretrial order.

While I believe the foregoing findings and conclusions answer all of the questions presented in subparagraphs A through K, inclusive, of Issue 2, I nevertheless, for advice of counsel, enter contemporaneously herewith a supplemental decision making direct answer to those questions.

Counsel for Holder will present form of judgment, order of foreclosure and sale consistent with the foregoing.